# Exhibit 2



*1060926023*

CV-25-233
Andrews

## IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

JAN 30 2025

RICK WARREN
COURT CLERK

| | |
|---|---|
| GREAT HORNED OWLS, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No. |
| | ) |
| OKLAHOMA CITY AIRPORT TRUST, | ) |
| | ) |
| Defendant. | ) |

108

CV - 2025 - 2 3 3

### PETITION

COMES NOW, Plaintiff, great horned owls, LLC ("GHO"), and for its cause of action against Defendant, Oklahoma City Airport Trust ("OCAT"), alleges and states as follows:

### I.
### PARTIES

1.      GHO is a foreign limited liability company registered to do business in the state of Oklahoma.

2.      OCAT is a public trust for the benefit of the City of Oklahoma City, which owns and operates the Will Rogers International Airport (the "Airport").

### II.
### JURISDICTION AND VENUE

3.      In accordance with Okla. Const. Art. VII, Sec. 7, jurisdiction is proper in this court.

4.      Venue is proper in Cleveland County, Oklahoma, pursuant to 12 O.S. § 132.

## III.
## STATEMENT OF FACTS

5.      Effective January 1, 2025, GHO acquired oil and gas operations from Contango Resources, Inc. for the East Wheatland Unit and Will Rogers Unit (collectively the "Units"), which are water flood units created by the Oklahoma Corporation Commission for the production of oil and gas.

6.      The Units include reservoirs beneath the Airport.

7.      Along with the unitization by the Oklahoma Corporation Commission, OCAT and the City of Oklahoma City, entered into that certain Oil and Gas Lease dated as of the 1st day of July 1980 (the "Lease") granting GHO's predecessor in interest the right to drill and operate oil and gas wells and/or injection wells supporting oil and gas recovery efforts at the Airport. See, Exhibit 1. Both the Lease and the Units have been producing in paying quantities since that time and continue in full and force and effect to this day.

8.      Paragraph 13 of the Lease requires OCAT's and the FAA's written pre-approval of all wells drilled at the Airport.

9.      Paragraph 21 of the Lease requires oil and gas operational activities not to injure the then-constructed facilities and not to materially and adversely affect the development, improvement, operation, or maintenance of the Airport or its facilities.

10.      The Plans of Unitization for the Units, attached as Exhibits 2 and 3, each refer to and incorporate the Lease and its terms and requires compliance with the Operational Covenants included therein.

11.      Nothing in the Lease or the unitization plans gives OCAT the right to require plugging and abandoning of any wells it previously approved.

2

12.    Nothing in the Lease or the unitization plans gives OCAT the right to prohibit access to the wells for maintenance and operation thereof, save and except provisions requiring the operator to maintain certain distances from runways and comply with federal, state, and local regulations and laws.

13.    The plans of unitization grant GHO the right to use the surface of the Airport, subject to the Operational Covenants, as necessary for operations of the East Wheatland Unit and Will Rogers Unit.

14.    On July 25, 2024, OCAT made demand on Contango Resources, Inc. to plug *twenty-four (24) oil and gas and/or injection wells*, claiming that the same were non-productive and interfered with planned development by the Airport.

15.    After GHO took over operations from Contango, it began to service the wells at the Airport.

16.    On January 15, 2025, OCAT sent a cease-and-desist letter generally averring that the service rig somehow breached the Lease. See, Exhibit 4. However, no specific examples are given as to how the maintenance and service of the wells being conducted by GHO injured or violated current airport operations is given.

17.    Nevertheless, on January 22, 2025, OCAT revoked—without explanation---the airspace approval needed to operate the service rigs GHO was using, effectively shutting down GHO's maintenance operations.

18.    OCAT's conduct in preventing GHO to service, maintain and/or repair its wells has placed the safety of the public and the environment at risk

19.    By unilaterally and without cause revoking GHO's ability to access the oil and gas and/or injection wells at the Airport with the service rigs required for necessary maintenance and

3

repairs, OCAT has breached the Lease and caused damages to GHO that accrue daily.

WHEREFORE, Plaintiff prays that this Court enter judgment as follows:

A.    Ordering OCAT to reinstate GHO's airspace approval immediately;

B.    Declaring that neither the Lease nor the plans of unitization give OCAT a right to require plugging of wells based on future development of the Airport;

C.    Ordering OCAT to pay GHO's damages; and

D.    For such other and further relief the Court deems just and equitable.

Respectfully submitted,

Patrick H. Lane, OBA #30885
Jordan M. LePage, OBA #32446
Grant P. Scowden, OBA #34277
BALL | MORSE | LOWE PLLC
531 Couch Drive, Suite 201
Oklahoma City, OK 73102
(405) 701-5355
(405) 701-2830 Fax
plane@bml.law
jlepage@bml.law
gscowden@bml.law
*Attorneys for Plaintiff*

4

3255    BOOK.1011 PAGE 7

OIL AND GAS LEASE    RCD 4743 PG 712

8342

THIS AGREEMENT, dated as of the 1st day of July, 1980, but actually executed hereinafter on the date set out, between OKLAHOMA CITY AIRPORT TRUST and THE CITY OF OKLAHOMA CITY, OKLAHOMA, hereinafter called Lessor, and EXCALIBUR OIL, INC., hereinafter called Lessee,

WITNESSETH:

1.    Lessor, for and in consideration of $364,146.08, in hand paid, receipt of which is hereby acknowledges subject to the terms and conditions set forth in the AGREEMENT dated _Aug. 18_, 1980, and of the covenants and agreements hereinafter contained on the part of the Lessee to be kept and performed, has granted, demised, leased and let, and by these presents does grant, demise, lease and let unto the said Lessee, for the sole and only purpose of exploring by geophysical and other methods, mining and operating for oil, liquid hydrocarbons, gas or their respective constituent products, all that certain tract of land situated in Cleveland and Oklahoma counties, Oklahoma, described on Exhibit "A" attached hereto and made a part hereof.

2.    Subject to the other provisions herein contained, this lease shall remain in force for a term of five (5) years from this date (called "primary term") and as long thereafter as oil, liquid hydrocarbons, gas or their respective constituent products, or any of them, is produced from said land or land with which said land is pooled.

3.    The royalties to be paid by Lessee are:  (a) on oil, and on other liquid hydrocarbons saved at the well, one-fourth (1/4) of that produced and saved from said land, same to be delivered free of cost at the well or to the credit of Lessor in the pipe line to which the wells may be connected; (b) on gas, including casinghead gas and all gaseous substances, produced from said land and sold or used off the premises or in the manufacture of gasoline or other products therefrom, the market value at the mouth of the well of one-fourth (1/4) of the gas so sold or used, provided that on gas sold at the

Return to:

EXHIBIT
1

BOOK 101    PAGE 77    BOOK 4743 PAGE 713

well, the royalty shall be one-fourth (1/4) of the amount realized from such sale. Said payments are to be made monthly. At any time, either before or after the expiration of the primary term of this lease, if there is a gas well or wells on the above land (and for the purpose of this clause, the term "gas well" shall include wells capable of producing natural gas, condensate, distillate or any gaseous substance and wells classified as gas wells by any governmental authority) and such well or wells are shut in before or after production therefrom, Lessee may pay or tender an advance annual royalty equal to One Dollar ($1.00) per acre for the acreage then held under this lease, and if such payment or tender is made, it shall be considered under all provisions of this lease that gas is being produced from the leased premises in paying quantities for one (1) year from the date such payment or tender is made, and in like manner subsequent advance annual royalty payments may be made or tendered and it will be considered under all provisions of this lease that gas is being produced from the leased premises in paying quantities during any annual period for which such royalty is paid or tendered; such advance royalty may be paid or tendered to Lessor or any successor thereof; royalty accruing to the owners thereof on any production from the leased premises during any annual period for which advance royalty is paid may be credited against such advance payments; and when there is a shut-in gas well or wells on the leased premises, it shall nevertheless continue in force for a period of ninety (90) days from the last date on which a gas well located on the premises is shut in, within which ninety-day period Lessee hereunder may commence to resume the payment or tender of the advance royalty as herein provided.

4.    If a well is not commenced for the production of oil or gas from said land or on lands unitized therewith on or before June 25, 1981, then this lease shall terminate as to both parties unless the Lessee shall, on or before said anniversary date of this lease, pay or tender to Lessor the sum of One Dollar ($1.00) per acre included in the described premises, which sum and payment shall operate as a rental and cover the privilege of deferring the commencement of a well for twelve (12) months from said date; provided, however, that the commencement of a well for the production of oil or gas on land pooled with a portion of the leased premises shall not be deemed to be the commencement of a well for the production of oil or gas as to any portion of the described premises not included in such pool or unit, and this lease shall terminate as to both parties as to that portion of the described premises not so unitized unless Lessee shall pay or tender to Lessor, in the manner and for the purposes set forth, the sum of One Dollar ($1.00) per acre on the acreage not included in a drilling and spacing unit. Tender of payment thereof may be made by mailing the same to Lessor on or before the date on which said rental is

BOOK 1011 PAGE 78

due; hereunder. In like manner and upon subsequent payments of tenders, the commencement of a well may be further deferred for periods of the same number of months consecutively, but in no event to exceed the primary term stated above.

BOOK 4743 PAGE 714

5. In the event a well or wells producing oil or gas in paying quantities should be brought in on any drilling and spacing unit established by the Corporation Commission of the State of Oklahoma which adjoins, either directly or diagonally, the Sections set forth on Exhibit "A," then Lessee shall be obligated to drill within ninety (90) days an offset well on the leased premises to protect against drainage; in the event of Lessee's failure to comply with said offset obligation, this lease shall terminate as to that offset acreage not drilled pursuant to this paragraph.

6. Lessee is hereby granted the right to pool or unitize this lease, the land covered by it or any part thereof with any other land, lease, leases, mineral estates or parts thereof for the production of oil, liquid hydrocarbons and all gases and their respective constituent products, or any of them. Units pooled for oil hereunder shall not exceed eighty (80) acres, and units pooled for gas hereunder shall not exceed six hundred forty (640) acres, provided that if any federal or state law, executive order, rule or regulation shall prescribe a spacing pattern for the development of the field or allocate a producing allowable on acreage per well, then any such units may, subject to prior written approval of Lessor, embrace as much additional acreage as may be so prescribed or as may be used in such allocation or allowable. Lessee shall file written unit designations in the county in which the premises are located. Such units may be designated either before or after the completion of wells. Drilling operations and production on any part of the pooled acreage shall, except as otherwise specifically provided herein, be treated as if such drilling operations were upon or such production was from the land described in this lease whether the well or wells be located on the land covered by this lease or not. The entire acreage pooled into a unit shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if it were included in this lease. In lieu of the royalties herein provided, Lessor shall receive on production from a unit so pooled only such portion of the royalty stipulated herein as the amount of his acreage placed in the unit or his royalty interest therein on an acreage basis bears to the total acreage so pooled in the particular unit involved.

7. Lessee shall have the right to use, free of cost, gas and oil produced on the above described premises for its own operations thereon. Lessee shall have the right at any time to remove all machinery and fixtures placed on said lands, including the right to

BOOK 101 PT 79 BOOK 4743 PG 715

draw and remove casing. When required by Lessor, Lessee will bury all pipe lines below ordinary plow depth. Lessee shall pay for damages caused by its operations to growing crops or structures on said land. No well site shall be located nor structure erected within 200 feet of any existing building or proposed building site without prior written approval of the Lessor. In the event of the discovery of natural gas in any well drilled on the described premises, such gas shall be furnished in the amount of one fourth (1/4) of gas royalties produced on Airport properties to any Lessor-owned structure or structures located on the leased premises by making connection at Lessor's expense. Gas used in excess of the royalty amount may be obtained by Lessor at Lessee's most current posted price.

8. Lessee covenants and agrees that it will defend, indemnify and save forever harmless The City of Oklahoma City and the Oklahoma City Airport Trust from any and all claims for damages of any kind or nature which may hereafter be made against the City and/or Trust on account of any personal injuries (including wrongful death) or property damage resulting from Lessee's activities on and/or use of the described premises; Lessee further agrees that Lessee will pay and indemnify the City and the Trust against all legal costs and charges including (by way of illustration and not limitation) counsel fees reasonably incurred by either or both in or about the defense of any suit for damages of any kind or nature which may hereafter be brought against the City and/or Trust on account of personal injuries (including wrongful death) or property damage resulting from Lessee's activities on and/or use of the described premises. In addition, Lessee shall, during the term of this agreement, purchase or provide Workmen's Compensation Insurance as required by the statutes of the State of Oklahoma, or adequate Employee's Liability Insurance, Public Liability and Property Damage Insurance covering all of Lessee's activities on the leased premises; the policy limits of the Public Liability Insurance to be not less than $100,000 for one person and $300,000 for any one accident involving injury (including wrongful death) to more than one person, with Property Damage Insurance of not less than $100,000 for any one accident. Lessee shall purchase all of the required insurance coverage from insurance carriers acceptable to Lessor, and Lessee shall furnish or cause to be furnished to Lessor a certificate of such insurance coverage which shall provide that the City and the Trust are additional insureds under said policy or policies of insurance and that said policy or policies cannot be cancelled or materially modified except upon ten (10) days' written notice to Lessor.

9. The rights of either party hereunder may be assigned in whole or in part and

BOOK **1011** PAGE **80**    BOOK **4743** PG **716**

the provisions hereon shall extend to the heirs, executors, administrators, successors and assigns but no change or division in ownership of the land, or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee. No such change or division in the ownership of the land, or royalties, shall be binding upon Lessee for any purpose until forty-five (45) days after such person acquiring any interest has furnished Lessee with the instrument or instruments, or certified copies thereof, constituting his chain of title from the original Lessor. In the event of an assignment of this lease as to a segregated portion of said land, the shut-in gas royalty payments payable hereunder shall be apportioned as between the several leasehold owners ratably according to the surface area of each, and default in payment by one shall not affect the rights of other leasehold owners hereunder. An assignment of this lease, in whole or in part, shall, to the extent of such assignment, relieve and discharge Lessee of any obligations hereunder, and, if Lessee or assignee of part or parts herein shall fail or make default in the payment of the proportionate part of the shut-in gas royalty payments due from such Lessee or assignee or fail to comply with any other provision of the lease, such default shall not affect this lease insofar as it covers a part of said lands upon which Lessee or any assignee thereof shall make payment of said shut-in gas royalty payments.

10.    Lessee shall not be liable for delays or defaults in its performance of any agreement or covenant hereunder due to force majeure. The term "force majeure" as employed herein shall meant any act of God including but not limited to storms, floods, washouts, landslides and lightning; acts of the public enemy; wars, blockades, insurrections, or riots; strikes or lockouts; epidemics or quarantine regulations; laws, acts, orders or requests of federal, state, municipal or other governments or governmental officers or agents under color of authority; or for delays due to requirements by the Federal Government that necessitate their approval before a well could be commenced under the terms and requirements as set out in this lease; freight embargoes or failures; exhaustion or unavailability or delays in delivery of any product, labor, service, or material. If Lessee is required, ordered or directed by any federal, state or municipal law, executive order, rule, regulation or request enacted or promulgated under color of authority to cease drilling operations, reworking operations or producing operations on the land covered by this lease or if Lessee by force majeure is prevented from conducting drilling operations, reworking operations or producing operations, then until such time as such law, order, rule, regulations, request or force majeure is terminated and for a period of ninety (90) days after such termination each and every provision of this lease that might operate to terminate it or the estate conveyed by it shall be suspended and inoperative

BOOK 10  PAGE 81  BOOK 4743 PT 717

and this lease shall continue in full force. If any such period of suspension occurs during the primary term, the time thereof shall be added to such term. No provision of this paragraph shall be construed to relieve the Lessee of the obligation to pay money under any terms of this Lease Agreement.

11.    This lease is made without warranty of title, either expressed or implied. Lessor may discharge any tax, mortgage or lien upon this land, and thereby shall become subrogated to such claim with the right to satisfy same out of royalties due under this lease. In case said Lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, than the royalties herein provided for shall be paid the said Lessor only in the proportion that his interest bears to the whole and undivided fee. If, for any reason whatsoever, the Lessor is required to reimburse the Federal government for their participation in the acquisition of any of the properties leased hereunder, Lessee agrees to indemnify the Lessor and pay damages up to a maximum of Two Thousand Dollars ($2,000) per acre.

12.    Lessee and Lessee's successors and assigns shall have the right at any time to surrender this lease, in whole or in part, to Lessor or his heirs and assigns by delivering or mailing a release thereof to the Lessor, or by placing a release thereof of record in the county in which said land is situated; thereupon Lessee shall be relieved from all obligations expressed or implied, of this Agreement as to the acreage so surrendered.

13.    The location of all wells upon the property described herein shall be subject to the written approval of Lessor, and the Federal Aviation Administration. In addition, the Lessor reserves the right to approve the location of storage tanks, power stations, telephone lines, structures of whatsoever nature and location of drilling site or sites, the location and method of installing pipe lines and all other installations of whatsoever kind in order to preserve as far as possible the safety factors involved in this airfield and around it and in order to protect and prevent the pollution of any water supply source of The City of Oklahoma City, including, among all the rest, the North Canadian River. The aforementioned approvals shall be given by Lessor in writing. In the above connection, Lessee agrees that its operations at all times will be conducted in strict conformity with applicable restrictions contained in Appendix, dated September 1, 1974, attached hereto and made a part hereof, and any other rules and regulations promulgated by the Corporation Commission of the State of Oklahoma governing oil and gas operations within the watersheds of Oklahoma City. Further, all of Lessee's operations hereunder shall be

BOOK 1011 PAGE 82    BOOK 4743  718

conducted in strict conformity with all rules and regulations controlling drilling operations in watershed areas of Oklahoma City reservoirs adopted or approved by the Oklahoma City Municipal Improvement Authority and/or by the Mayor and the City Council of The City of Oklahoma City, and any subsequent amendments thereto.

14.    All drilling and other activities and operations of the Lessee hereunder shall be conducted in strict conformity with all applicable provisions of the laws of The City of Oklahoma City and of the State of Oklahoma. Further, Lessee shall have the sole and exclusive responsibility of obtaining, at its sole expense, all permits required before commencing drilling operations for the drilling of a well on the demised premises, before drilling such well, and before producing oil or gas from such well. In this connection, it is expressly understood by the Lessee that the granting of this lease shall in no way be construed as exempting the Lessee from obtaining required permits and/or conducting its activities and operations in strict compliance with all federal, state or local statutes, ordinances, regulations and standard rules applicable to Lessee or its use of the demised premises.

15.    Written notice of intent to drill must be provided to the Lessor and the Federal Aviation Administration for each well location. Such notice must be given at least 30 days and not more than 60 days prior to commencing drilling operations. If there is no objection from either the F.A.A. or Lessor, the well may be drilled at the specified location, provided said location does not contravene other provisions of the lease. Drilling rigs must use steel mud pits. Immediately after completion of drilling operations, all fluids should be hauled from the reserve pits so as to permit backfilling, leveling, and sodding at the earliest possible time. In the event drilling on the described land shall result in production, Lessee, at its own cost and expense, shall immediately remove all temporary structures and place all permanent equipment in a manner as will not interfere with or introduce hazard to the operation of aircraft; the well site shall, at Lessee's expense, be suitably graded and surfaced with crushed stone and shall be fenced with chain-link material or equivalent, set on steel posts, unless Lessor shall direct otherwise; all surface equipment must be painted and oil free at all times. Should drilling result in a dry hole, Lessee shall, at its own expense, immediately remove all temporary structures from the land, restore the same to its former condition, and level the area so that it may be safely used for landing and taxiing of aircraft.

16.    Correspondence of whatsoever nature and inquiries shall be addressed to

BOOK 1011 PAGE 83

Lessor at Oklahoma City Airport Trust, Will Rogers World Airport, P.O. Box 59937, Oklahoma City, Oklahoma 73159.

BOOK 4743 PG 719

17.    It is understood and agreed by the parties hereto that the Lessor holds its title to the leased premises as set forth in the instruments and documents under which Lessor acquires said leased property, with all the terms, conditions, restrictions, and covenants running with the land, and this lease is intended to grant only a temporary and incidental use of only such portions of the leased premises as will not interfere with its primary and presently needful use and purpose.

18.    This lease and all provisions thereof shall be subject to all the terms and conditions of the instruments and documents under which Lessor acquired said leased property and all laws, rules and regulations in any way affecting said property, and shall be given only such effect as will not conflict or be inconsistent with such terms and conditions.

19.    It is specifically understood and agreed that the Lessee shall conduct any, and all of its activities authorized by this lease in such manner as to provide a clear space for the maneuvering and flight of aircraft on and above the ground surface for a distance of 500' either side of the centerline of all precision instrument runways and 250' either side of the centerline of all non-precision runways and 125' either side of centerline of all utility runways, thence a side slope of not less than 7' horizontally to 1' vertically. Extending outward from the elevation of the centerline of all runways as now located on said airport premises and remainder of said airport.

20.    It is further agreed that no structure shall penetrate the clear zone as described:  Runways 17L-35R and 17R-35L, Precision Instrument Runway extending outward from center line of runway, 500 feet each way; THENCE outward and upward a slope of 7 feet horizontal and one foot verticle (7 to 1), Runway 12-30, Non-Precision Instrument Runway, extending outward from center line of runway, 250 feet each way; THENCE outward upward at a 7 to 1 slope, Runway 18-30; Utility Runway extending outward from center line of runway, 125 feet each way; THENCE outward upward at a slope of 7 to 1, nor penetrate the runway approach zone when slope of runway approach zone is temporarily raised to 34 feet horizontally to one foot vertically during exploration or rework, all other times the slope and size of runway approach zone shall be an imaginary surface as described:  Runway 17L-35R and Runway 17R-35L shall be 1,000 ft.

BOOK 1011 PAGE 84   BOOK 474   720

wide at a point 200 feet beyond runway; THENCE outward along runway center line a
distance of 50,000 feet to a width of 16,000 feet.  The slope shall be 100 to 1 for the first
10,000 feet; THENCE 40 to 1 for the remaining 40,000 feet.  Runway 12-30 shall be 500
feet wide at a point 200 feet from end of runway; THENCE extending along center line of
runway 10,000 feet to a width of 3,500 feet.  The slope shall be 50 to 1 the entire length.
Runway 18-36 shall be 250 feet wide of a point 200 from end of runway; THENCE
extending along center line of runway 5,000 feet to a width of 1,250 feet.  The slope shall
be 34 to 1.  Said areas delineated on Exhibit "B," attached hereto and made a part hereof.

21.   Lessee's operational activities shall be conducted in such manner as not to
injure or destroy any of the presently constructed facilities on the airport and leased
premises, and in such manner as not to materially and adversely affect the development,
improvement, operation, or maintenance of the airport or its facilities.

22.   It is further agreed that Lessee shall not interfere with the access roads to the
airport, and shall not interfere with any other person or agency having a lawful right to
use said leased premises, or with any buildings, or improvements of any kind thereon,
belonging to any other person or agency, nor with their right to enter thereon and remove
said buildings or improvements therefrom.

23.   This lease is subject and subordinate to and is controlled by all the provisions,
stipulations, covenants and agreements in that certain Instrument and Transfer dated
January 31, 1946, from the United States of American to Lessor, deed records conveying
certain airport properties to Lessor the same as if set out in full herein, and Lessee agrees
to abide by and enforce all such provisions, stipulations, covenants and agreements.

This lease is also subject to all orders, rules and regulations of the F.A.A. now
in force or hereafter promulgated and Lessee agrees to abide by and enforce all of same
and all such rules, regulations and orders are made a part hereof the same as if set out in
full herein.  This lease is subject to the written consent of the Federal Aviation Agency
and shall be effective only as of the date of such written consent in accordance with the
provisions of the above instrument.

24.   This lease is subject and subordinate to the provisions, stipulations, covenants
and agreements in that certain Grant Agreement dated March 28, 1950 between F.A.A.

BOOK 1011 PG   85   BOOK 4743 PG 721

ind; The City of Oklahoma City, Oklahoma, accepted by the sponsors on April 22, 1980, and it is further understood that the provisions, stipulations, covenants and agreements in the above Grant Agreement are incorporated herein and made a part hereof the same as if set out in full herein. This lease is subject to the written consent of the Federal Aviation Agency and shall be effective only as of the date of such written consent. Moreover, any other provision of this lease notwithstanding, this lease shall be subordinate to the provisions of any existing or future agreement between Lessor and the United States, relative to the operation or maintenance of the airport, the terms and execution of which has been or may be required as a condition precedent to the expenditure or reimbursement to Lessor of Federal funds for the development of the airport.

IN WITNESS WHEREOF, this Agreement is executed by the parties hereto on August 18 , 1980.

APPROVAL RECOMMENDED:

_____
Leroy B. Hansen
Director of Airports

OKLAHOMA CITY AIRPORT TRUST

_____
James J. Cook, Trustee

_____
Ken W. Townsend, Trustee

LESSEE:

EXCALIBUR OIL, INC.

ATTEST:

_____
Assistant Secretary

_____
Title   Vice-President
Jim D. Brewer

APPROVED by the City Council of the City of Oklahoma City this 26 day of August , 1980.

_____
Mayor

ATTEST:

_____
City Clerk

APPROVED as to form and legality this 18 day of Aug. , 1980.

_____
Assistant Municipal Counselor

BOOK 1011 PAGE 16

STATE OF OKLAHOMA    )
                     ) ss.
COUNTY OF OKLAHOMA   )

BK 4743 PG 722

Before me, the undersigned, a Notary Public in and for said County and State, on the 19 day of _____, 1980, personally appeared _____ and _____, to me known to be the Trustees of the Oklahoma City Airport Trust, and to me further known to be the identical persons who subscribed the names of the makers thereof to the foregoing instrument of writing, and acknowledged to me that they executed the same as their free and voluntary act and deed, and as the free and voluntary act and deed of the Oklahoma City Airport Trust for the uses and purposes therein set forth.

GIVEN under my hand and seal the day and year last above written.

_____
Notary Public

My Commission Expires:

October 11, 1981

STATE OF OKLAHOMA    )
                     ) ss.
COUNTY OF OKLAHOMA   )

Before me, the undersigned, a Notary Public in and for said county and state, on this 19 day of _____, 1980, personally appeared _____, to me known to be the identical person who subscribed the name of The City of Oklahoma City, Oklahoma, to the foregoing instrument as its Mayor, and acknowledged to me that he executed the same as his free and voluntary act and deed, and as the free and voluntary act and deed of such City, for the uses and purposes therein set forth.

GIVEN under my hand and seal the day and year last above written.

_____
Notary Public

My Commission Expires:

October 11, 1981

BOOK 1011 PAGE 87

1% 4743 PG 723

STATE OF OKLAHOMA )
                       )  ss,
COUNTY OF OKLAHOMA )

Before me, the undersigned, a Notary Public in and for said county and state, on the 22 day of January, 1980, personally appeared Jim D. Brewer a member of the firm of Excalibur Oil, Inc. to me known to be the identical person who executed the within and foregoing instrument on behalf of said firm, and acknowledged to me that he executed the same as his free and voluntary act and deed, and as the free and voluntary act and deed of said firm, for the uses and purposes therein set forth.

GIVEN under my hand and seal the day and year last above written.

_____
Notary Public

My Commission Expires:

6-27-81

BOOK 1011 PAGE 88
CPC 4743 PG 724

EXCALIBUR OIL, INC.

EXHIBIT "A"

August 1980

Will Rogers World Airport:

| Section | Township | Range | Acres |
|---|---|---|---|
| W/4, 24 | T11N | R4W | 92 |
| 23 | " | " | 609 |
| 22 | " | " | 606.4 |
| SE/4, 21 | " | " | 174.4 |
| W/2, 25 | " | " | 238.0 |
| 26 | " | " | 643.4 |
| 27 | " | " | 637.6 |
| E/2, 28 | " | " | 318.8 |
| E/2, 33 | " | " | 320 |
| 34 | " | " | 640 |
| 35 | " | " | 643.4 |
| W/2, 1 | T10N | " | 192.0 |
| 2 | " | " | 624.2 |
| 3 | " | " | 628 |
| N/2, 10 | " | " | 312.8 |
| N/2, 11 | " | " | 310.2 |
| SW/4, SW/4, 14 | T11N | " | 35 |
| SE/4, SE/4, 15 | " | " | 35 |
| Total, WRWA | | | 7,061.2 |

*are Section 29 and N/2 Section C⁷), 10N⁴ᵗʰ K, Cleveland County, Oklahoma*

20, N/2 Section 29 and N/2 Section Oklahoma.

...icant dismissed that part of the ... in Township 11 North, Ranges 1,

...isdiction of the subject matter here- ...rts as required by law and the

...thin the described area since ...inclose that the field rules should ...e the underground fresh water within ...future source of fresh water for the ...y areas, and this application

**DO NOT REMOVE!!!**
**This is the Appendix**
**which is an attachment**
**Per Paragraph 13!!!**

...Corporation Commission that Order ...s hereby amended with respect to the following described lands situated in Cleveland County, Oklahoma:

Sections 1, 2, 3, 10, 11, 12, 13, 14, 15, 22, 23 and 24, 10N-3W, Cleveland County, Oklahoma;

N/2 Section 25, N/2 Section 26 and N/2 Section 27, 10N-3W, Cleveland County, Oklahoma;

Sections 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23 and 24, 10N-2W, Cleveland County, Oklahoma;

N/2 Section 25, N/2 Section 26, N/2 Section 27, N/2 Section 28, N/2 Section 29 and N/2 Section 30, 10N-2W, Cleveland County, Oklahoma;

Sections 5, 6, 7, 8, 17, 18, 19, 20, N/2 Section 29 and N/2 Section 30, 10N-1W, Cleveland County, Oklahoma.

to hereafter provide as follows:

**A. EARTHEN PITS**      *the watershed of the N. Canadian River*

(1) Within the drainage area of ~~Sterley Draner, Lake or any other body of the Applicant,~~ no earthen slush pits or reserve pits shall be constructed. Drilling mud operations shall be conducted in tanks and shall be removed from the property upon completion of the well.

(2) Earthen pits, outside the drainage area perimeter, may be constructed and utilized for emergency purposes only; their use is limited to emergency storage purposes of overflow resulting from malfunction of equipment. After such use they shall be emptied as soon as possible. Pits not being utilized shall remain dry.

(3) Earthen pits, outside the drainage area perimeter may be utilized for the storage of cuttings resulting from drilling operations. After the cessation of drilling operations and after the pits are sufficiently dry they shall be covered and the surface area levelled.

(4) All oil or condensate in tanks shall be removed after any swabbing or drilling operations.

*Appendix*
*Sept. 1, 1974*

... ... ... ... ... ...

ll site is level ... on sloping or uneven ground . The top of the retaining
wall shall be at least level with the base of the Christmas
Tree or other wellhead connections ... any completed well, or at least level
with the ground at the point where surface casing is set in the well when
drilling.

(2) At the option of the Operator, rainwater drains, with proper con-
trols, may be installed through firewalls and dikes.

C.  MASTERGATES, ETC.

All drilling wells will be equipped with a mastergate, or its equiva-
lent, adequate blowout preventors, adequate flow lines and valves commensu-
rate with working pressures involved.

D.  WELL SITE                                    *the N. Canadian River*

(1) Within one-half (1/2) mile of the high water mark of ~~Keystone Grand~~
~~lake, or any other lake of Hontione~~, that part of the superstructure of
any drilling rig adjacent to or facing such ~~lake will likes and being~~ above
the elevation of the ground around the perimeter of the ~~tank~~ will be
covered with canvas, sheet metal or other suitable material during all
drilling operations.

(2) All leases shall be kept clean of refuse and other deleterious
matter resulting from drilling and production operations.

(3) An oil saver shall be used in swabbing operations and all oil
swabbed shall be placed into tanks.  During the drilling and completion,
drilling mud of adequate weight shall be in the hole, casing and tubing to
prevent blowout.

(4) In the event any well is out of control, all condensate, oil, mud,
salt water and other wastes from the well shall be blocked off and shall
not be permitted to enter surface streams or lakes.

(5) Each leaking pump, stuffing box, line, tank, or connection shall
be promptly repaired.

(6) All hydrocarbons, water and deleterious substances from wet
strings of tubing shall be contained until the operation is completed.

(7) All oil cellars and other oil sumps shall be pumped out.

(8) Tanks shall be used for collection of all basic sediment or dele-
terious substances.

(9) Artificial lift equipment may be powered by electric motor or
internal combustion engine with the exhaust from such internal combustion
engine being muffled.

(10) During the drilling of all wells, all motors shall be equipped
with adequate mufflers to reduce the noise level and the mufflers shall
be cooled with water, when necessary, to prevent explosions.

(11) Safety type lights shall be used in drilling operations.

(12) Upon completion of a well, all lines, including flow lines, gas
lines, and water lines, shall be buried below the level of cultivation.
These lines shall be constructed of material which shall insure the
greatest possible duration.

(13) Equipment, pipe, pumps, tanks, and other appurtenances used in
conducting operations shall be maintained at all times to prevent leakage
or escaping of salt water, oils, or other deleterious substances.  If other
than new casing is used for completion casing, pressure tests shall be

ressure to used in the operation. Ca____ which fails this test shall not
be used in a well. Both surface cas____ and completion casing will be
pressure tested before drilling out cement or perforating as prescribed
in Rule 206 (f) of the Regulations of the Oklahoma Corporation Commission.

E.  SURFACE CASING

(1)  Suitable and sufficient surface casing shall be run and cemented
to a depth not less than one hundred fifty (150) feet below all fresh
water strata encountered in the well.  Sufficient cement shall be circu-
lated to fill the annular space behind the surface casing from the base
thereof to the surface of the ground.          *Okla. City Water Department*

(2)  A field print of an electrical log (including the log heading)
from 1000 feet below the surface casing to the base of the surface casing
shall be submitted to the ~~Conservation Division~~ for inspection and approve
immediately upon the completion of drilling operations.   *Okla. City Water Department*

(3)  If the ~~Conservation Division~~ determines from the electrical log
that there are fresh water zones below the base of the surface casing, the
annular space behind the production casing shall be stage cemented from
a point 150 feet below the lowest fresh water strata before the well is
completed; or in the alternative, the operator may run an intermediate
string of casing to a point 150 feet below the lowest fresh water zone and
circulate cement to the surface.

(4)  The operator may set 1200 feet of surface casing and circulate
cement to the surface, in lieu of the requirements of sub-paragraphs
1, 2, and 3, above.

F.  PRODUCTION CASING

Production casing of a size of not less than 5-1/2" O.D., in good and
serviceable condition shall be set not higher than the top of the pro-
ducing formation and cemented with sufficient amount of cement to obtain a
minimum of 500 feet of annular fillup above the base of the casing.  All
production casing will be tested by pressure methods for either drilling
the cement plug or perforating if cement is not drilled.

G.  WELLHEAD EQUIPMENT

Upon the completion of any well, the wellhead equipment shall have,
on the tubing, at least one master valve plus a flow valve, and a valve on
the casing annulus.

H.  TUBING

All wells shall be equipped with flow tubing not less than 2" I.D.,
the tubing length to be not less than 50 feet from the top of the lowest
producing formation.

I.  CONSTRUCTION OF TANKS, ETC.

All tanks and batteries shall be constructed so as to prevent leakage.
Earthen retaining walls or dikes, or firewalls should be constructed
around such installations with the capacity of the retained area to be
1-1/2 times the liquid capacity of the tanks within the retained area.

J.  SALT WATER DISPOSAL

Salt water disposal shall be by collection in steel tanks and trucking
of the water away from the lease or disposal beyond the area covered by
this lease or by subsurface disposal in the immediate area, and subject to
the approval of the ~~Conservation Department~~.  Any salt water disposal
well shall be equipped with tubing not smaller than 2" I.D. set on a
packer.  A pressure gauge shall be installed on the casing annulus at all
times.

*Okla. City Water Department*

~~rules, or~~ ~~those rules or their~~ ~~Corper ion~~ Commission in effect
~~io orders, rules~~ ~~d regulations of~~ on the date hereof.

L.  NOTICE AND REPORTS

~~(1)  Notice shall be served in writing upon the City Attorney of Oklahoma City where any application is filed seeking an exception to the rules prescribed by this Order, or seeking an amendment, modification, alteration or clarification of this Order.~~

~~(2)~~ Service companies, including drilling contractors and their employees and agents shall keep reports of all operations conducted by them, and such reports shall be available for inspection by the Commission's agents.  In the event that irregularities are found in these reports, a report shall be made to the Commission for its action.



Charles Nesbitt, Chairman

Ray C. Jones, Vice-Chairman

Wilburn Cartwright, Member

ATTEST:

Ed Overholser, Secretary

## M. MORE STRINGENT REQUIREMENTS PREVAIL

If any of the provisions or requirements contained in the body of the lease agreement attached are more stringent than any similar requirement set forth in this Appendix, then the more stringent provision or requirement contained in the lease agreement shall prevail.

IN WATERS' AREAS OF OKLAHOMA     WATER RESERVOIRS

NOV 12 1974

BY THE CITY COUNC

CITY CLE

### I.

The following rules and regulations in no way replace the present rules and regulations of the Oklahoma State Corporation Commission governing oil field operations, but are in addition to or establish minimums for the present rules.  Full compliance with these rules and regulations is a condition precedent to the right to use any public domain including streets, roads, alleys, or rights-of-way.

### II.

No well-prospecting for oil, gas, or any other substance shall be permitted within 660 feet of the diversion canal at the south end of Lake Hefner, nor within 660 feet of the centerline of the inflow canal from the Canadian River to Lake Hefner, nor within 660 feet of the planned future shoreline of the proposed West Elm Creek Lake.

### III.

No well-prospecting for oil, gas, or any other substance shall be permitted within the watershed of an Oklahoma City water reservoir unless it is located on the surface of such watershed in no case closer than 660 feet to the high-water shoreline of said reservoir, and unless it is also in such a position where surface fluid drainage from the well-site to the lake shall afford an indirect, natural, or constructed distance of travel along the drainage course to the lake of not less than 1,320 feet.

### IV.

Any well permitted under Paragraph III above to be located within the watershed in which an Oklahoma City water reservoir is contained, shall

(rev. 10-30-74)

-1-

1. Prior to the commencement of any drilling operation, an artificial barrier shall be constructed completely surrounding the well site no closer than fifty (50) feet from the well bore. The top of the artificial portion of the barrier to be constructed down drainage from the well shall be level at all points, at a height of no less than two (2) feet above the ground level at the well bore, in order that any deleterious matter from the well or operations thereon would be trapped and stored before such matter can enter the drainage to the reservoir. An adequate diversion ditch or dike shall be constructed across and around the uphill edge of the well site so that no surface drainage water can enter the area of the well location.

   Any gate in the barrier will be kept closed at all times. Any fluid trapped within the well site will be pumped into steel tanks for storage and removal. The gate in the barrier may be temporarily opened under supervised conditions for rainwater drainage, and then only if it can be demonstrated that such rainwater has not been contaminated with oil, chemicals, salt or any other deleterious substances.

2. In addition to the well site dike, the operator shall construct a secondary protection dike at some point between the well site and the reservoir across any drainage channels in such a manner that any fluid flowing downstream from the well site could be trapped. This secondary dike shall contain a gate which can be closed by one man. The gate shall be left open at all times except when and if control of the well is lost, in which event the gate in the secondary dike shall be immediately closed and left closed until control of

-2-

dike pool, the pool shall be pump    ry an.  .he pool area cleaned
of contaminants before the gate    the secondary dike is reopened.

3.  No earthen slush pits or reserve pits shall be constructed.  Drill-
ing mud operations shall be conducted in steel tanks, and shall be
removed from the property immediately upon completion of the well.

4.  Conductor casing shall be set at a minimum of fifty (50) feet or
to any greater depth required to penetrate the overlying alluvium,
and thirty (30) feet into bed rock.  The conductor hole shall be
drilled with air or fresh water and native mud.  No chemicals
or foreign substances are to be added to the drilling fluid.
Cement must be circulated to surface.

5.  Surface casing shall be set at a minimum depth of 1,200 feet, or
at a greater depth if required by the Corporation Commission, in
order to both protect fresh water-bearing strata and to remove any
possibility of contaminating fluids or gases reaching the surface
through vertical fracture systems or along fault planes.  Surface
casing shall consist of K Series 8-5/8-inch,   32-pound pipe, or
the equivalent quality for larger or smaller diameter holes.  If
used casing is utilized, it shall be of similar original quality,
and must be tested to assure its capability to significantly exceed
the highest known or projected subsurface or artificially induced
pressure expected to be encountered or used in this area of the
state, down to the stratigraphic depth to be penetrated.

a.  The surface casing hole shall be drilled with air or fresh
water using native on or near location mud.  Chemically inert

-3-

material .ay be added to the     id syst   a     .
of the fresh water filtra   from a solution of the added
material remains inert and of a nonpolluting nature.

    B.  In setting the surface casing, centralizers shall be placed
near the base of the shoe joint, and at least every sixty (60)
feet above that depth to the surface in order to assure a good
cement sheath.  Cement shall be circulated to surface and
allowed to set at least 48 hours before re-entering the well
bore.

    c.  A cement bond log shall be run from the casing shoe to surface
and a good bond must be demonstrable.  If a good bond is not
obtained, the casing will be perforated and squeeze-cemented
until a good bond is achieved and demonstrated with an addi-
tional bond log.

    d.  Prior to cementing surface casing, each operator shall notify
the Water Utilities Director of the City of Oklahoma City of
his intention to set and to cement surface casing.  Such notice
shall be given sufficiently in advance of such operation so as
to permit said party to have a representative present when said
casing is run and cemented if they so elect.

  6.  Dual hydraulically operated blowout preventers shall be installed on
the surface casing prior to drilling below the casing shoe.  Both
preventers shall be tested immediately after installation and period
ically thereafter, to assure that they are in good working order.
At the request of an official inspector appointed by the City of
Oklahoma City, the working order of both blowout preventers will be

-4-

cease at a  time either of the    venters ; inoperative. Dual
blowout preventers will also b.  nstalled prior to working over
an old well or testing new zones.  If tubing is to be pulled from
a producing well, blowout preventers shall be operative if the
producing reservoir has a bottom hole pressure in excess of
1,000 pounds.

7.  Operators shall mud-up prior to drilling out below the casing shoe.
Drilling mud weight and condition shall be maintained at all times
in a proper condition to control any anticipated or projected sub-
surface pressures or to quickly control unexpected pressure problems.

8.  In the event any well blows out or becomes out of control, the
operator shall immediately notify the Water Utilities Director of
the City of Oklahoma City by telephone or personal contact, and such
Director and his agents shall have full access to the well site and
surrounding area to take such measures as they deem necessary to
protect the reservoir from pollution or other damages.

a.  All condensate, oil, mud, salt water, and other wastes from the
well shall be blocked off and shall not be permitted to enter
the reservoir or surface streams.

b.  The operator will anticipate the worst possible blowout or
overflow conditions, and shall have on location at all times
sufficient material and equipment to prevent pollutants from
entering the reservoir under any conceivable conditions.

c.  The company or person conducting operations shall be solely
responsible for all damages and shall immediately restore the
surface to its original condition.

-5-

soil shall    physically removed    a the    is.

    a.  If the well is completed as a dry hole, the area shall be
        restored to normal and reseeded to prevent erosion.

    b.  If the well is completed as a producer, a rainwater drain may
        be installed in the dike but kept closed except for supervised
        occasional draining of the well site.

10.  Upon completion of a well, all lines, including flow lines, gas
     lines, water lines, and electric lines, shall be buried to a minimum
     depth of four (4) feet. All lines shall be plastic-coated internally
     and externally with sufficient materials to expect them to serve the
     property for the life of the well. After being covered, all ditch
     rights-of-way shall be resodded at the direction of the surface
     owners.

11.  In addition to the well site dike, all tanks, batteries, separators,
     heater treaters, etc., shall be enclosed with earthen retaining
     walls, dikes or firewalls so that the enclosed area has a storage
     capacity at least one and one-half (1½) times the liquid capacity
     of the tanks within the storage area.

12.  Equipment, pipe, pumps, tanks, and other appurtenances used in con-
     ducting operations shall be maintained at all times to prevent
     leakage or escaping of salt water, oils, or other deleterious sub-
     stances. Pressure tests shall be made on tubing and casing prior
     to their use to determine whether such casing or tubing is adequate
     and sufficient to withstand the maximum pressure to be used.

13.  All oil in tanks shall be promptly removed after any swabbing or
     drilling operation.

-6-

14. Tanks shall not be allowed to ~ "rluw.

15. All leaking pumps, stuffing b   s, lines, tanks and connections
    shall be promptly reported, and shall not be used while leaking.

16. All oil, water or deleterious substances from set strings of
    tubing shall be drained into steel tanks.

17. All oil cellars and oil sumps shall be promptly pumped out.

18. All ditches shall be kept clean and in good state of repair.

19. All leases shall be kept clean of refuse and other deleterious
    matter.

20. Service roads shall be constructed and maintained to control
    erosion. Upon completion of the well, all excess roads and loca-
    tions shall be returned to the original condition. All oil or
    salt-saturated material shall be physically removed from the property
    and grass sodded over the entire area in order to prevent erosion
    of the area and consequent silting of the reservoir.

21. A protective fence with metal gates shall be installed and kept
    locked at all times to prevent unauthorized persons from entering
    the premises.

22. A blowout preventer shall be installed on the surface casing and
    tested prior to cutting off and pulling production casing.

23. All wells shall be plugged according to the rules and under the
    direction of the Oklahoma State Corporation Commission.

24. An inspector designated by the City of Oklahoma City shall have
    access to the well site for inspection of compliance with these
    rules. Service companies, including drilling contractors and their
    employees and agents, shall keep reports of all operations conducted

-7-

the authorized representative of the City of Oklahoma City. If a violation is found and if corrective action is not taken immediately, the company conducting the operations shall be notified and shall stop operations until the unsatisfactory condition or practice has been corrected.

25. Each operator shall post a bond, or show proof of insurance before drilling operations commence, payable to the Oklahoma City Municipal Improvement Authority and the City of Oklahoma City, as named insureds, in the amount of $10,000,000.00 covering damages from pollution to the water reservoir caused by his operation, which bond or insurance shall specifically cover and include the following losses:

The value of all water stored in the reservoir and its possible loss by draining because of pollution; all direct and indirect cleanup and administrative costs to restore the reservoir to a safe, fillable condition; the fill-up cost; the loss of revenue to the City of Oklahoma City during draining and refilling; any cost to the City to supplement water supply until the reservoir is back in service; any additional cost of water treatment resulting from contamination; any punitive costs levied by the courts if negligence is proven on the part of the operator.

-8-

## PLAN OF UNITIZATION

### WILL ROGERS UNIT

### OKLAHOMA COUNTY, OKLAHOMA

MAY 1, 1992

COPY OF Billing
Sheet & EXtra
COPY OF PLAN
OF UNITIZATION
GIVEN TO TOM
ON 11/23/92

10-30-92
Per Bill —
Send Heather
copy to Reann
Willis.

MR.

EXHIBIT

2

PLAN OF UNITIZATION

WILL ROGERS UNIT

OKLAHOMA COUNTY, OKLAHOMA

TABLE OF CONTENTS

SECTION                                                    PAGE NUMBER

ARTICLE 1
DEFINITIONS

1.1      Unit...................................................      1
1.2      Unit Area.............................................      1
1.3      Unitized Formation....................................      1
1.4      Unitized Substances...................................      1
1.5      Allocable Unitized Substances.........................      1
1.6      Oil and Gas...........................................      2
1.7      Working Interest......................................      2
1.8      Royalty Interest......................................      2
1.9      Royalty Owner.........................................      2
1.10     Working Interest Owner, Owner or Lessee...............      2
1.11     Operating Committee...................................      2
1.12     Tract.................................................      2
1.13     Unit Operating Agreement..............................      2
1.14     Unit Operator.........................................      2
1.15     Tract Participation...................................      2
1.16     Unit Participation....................................      2
1.17     Outside Substances....................................      2
1.18     Oil and Gas Rights....................................      2
1.19     Unit Operations.......................................      3
1.20     Unit Equipment........................................      3
1.21     Unit Expense..........................................      3
1.22     Effective Date........................................      3
1.23     Commission............................................      3
1.24     Person................................................      3
1.25     Singular and Plural - Gender..........................      3
1.26     Joint Account.........................................      3
1.27     Phase.................................................      3

ARTICLE 2
EXHIBITS

2.1      Exhibits........................................  3
         2.1.1    Exhibit A...........................  3
         2.1.2    Exhibit B...........................  3

2.2      Reference to Exhibits.......................  3

2.3      Correcting Errors...........................  3


ARTICLE 3
CREATION AND EFFECT OF UNIT

3.1      Oil and Gas Rights Unitized.................  4

3.2      Personal Property Excepted..................  4

3.3      Amendment of Leases and Other Agreements....  4

3.4      Continuation of Leases and Term Royalties...  4

3.5      Titles Not Transferred......................  4

3.6      Development Obligation......................  5

3.7      Injection Rights............................  5


ARTICLE 4
PLAN OF OPERATION

4.1      Unit Operator...............................  5

4.2      Operating Methods...........................  5

4.3      Change of Operating Methods.................  5

4.4      Cooperative Agreements......................  5


ARTICLE 5
ALLOCATIONS OF UNITIZED SUBSTANCES

5.1      Tract Participation.........................  6

5.2      Relative Tract Participations...............  6

5.3      Allocations to Tracts.......................  6

5.4      Distribution Within Tracts..................  6

5.5      Taking Unitized Substances in Kind..........  6

5.6      Failure to Take in Kind.....................  7

5.7      Responsibility for Royalty Settlements......  7

5.8      Sliding Scale Royalty.......................  7

5.9      Royalty on Outside Substances...............  7
         5.9.1    Gas.................................  7
         5.9.2    Liquid Hydrocarbons.................  8
         5.9.3    Other...............................  8

5.10     Ownership of Outside Substances.............  8

ARTICLE 6
USE OR LOSS OF UNITIZED SUBSTANCES

6.1    Use of Unitized Substances.................    8

6.2    Royalty Payments..........................    8


ARTICLE 7
PRODUCTION AS OF THE EFFECTIVE DATE

7.1    Oil or Liquid Hydrocarbons in Lease Tanks...    8

7.2    Overproduction............................    9


ARTICLE 8
TITLES

8.1    Title Information.........................    9

8.2    Warranty and Indemnity....................    9

8.3    Production Where Title is in Dispute........    9

8.4    Payment of Taxes..........................    9

8.5    Payment of Taxes to Protect Title..........    10

8.6    Transfer of Title.........................    10


ARTICLE 9
EASEMENTS OR USE OF SURFACE

9.1    Grant of Easements........................    10

9.2    Use of Water..............................    10

9.3    Surface Damages...........................    11

9.4    Airport Lease.............................    11


ARTICLE 10
INDIVIDUAL RELATIONSHIPS AND RIGHTS

10.1    No Partnership...........................    11

10.2    No Sharing of Market.....................    11

10.3    Information to Royalty Owners.............    11


ARTICLE 11
GENERAL POWERS OF UNIT OPERATOR

11.1    General Powers of Unit Operator...........    12


ARTICLE 12
FORCE MAJEURE

12.1    Force Majeure............................    12


ARTICLE 13
NOTICES

13.1    Notices..................................    12

13.2    Notice of Transfer of Title..............    12

ARTICLE 14
ORGANIZATION AND EFFECTIVE DATE

14.1    Designation of Representatives.............    12

14.2    Organizational Meeting......................    13

14.3    Effective Date..............................    13

14.4    Orders Approving Unit - When Final..........    13

14.5    Nonapproval of Plan of Unitization
        by Commission...............................    13

14.6    Failure to Take Over Operations.............    13

14.7    Certificate of Effectiveness................    14


ARTICLE 15
TERM

15.1    Term........................................    14

15.2    Effect of Termination.......................    14

15.3    Salvaging Equipment Upon Termination........    14

15.4    Certificate of Termination..................    14

15.5    Obligation Payable After Termination........    15


ARTICLE 16
AMENDMENT TO PLAN OF UNITIZATION
AND ENLARGEMENT OF UNIT

16.1    Amendment and Enlargement...................    15


ARTICLE 17
GENERAL

17.1    Amendments Affecting
        Working Interest Owners.....................    15

17.2    Action by Working Interest Owners...........    15

17.3    Lien and Security Interest..................    15

17.4    Carved-Out Interest
        Subject to this Agreement...................    15


ARTICLE 18
CONFLICT

18.1    Conflict with Unit Operating Agreement......    15


ARTICLE 19
RENTAL SETTLEMENT

19.1    Payment of Rental or Minimum Royalties......    16


ARTICLE 20
GOVERNMENTAL AUTHORITY

20.1    Law and Regulations.........................    16

## ARTICLE 21
### COOPERATIVE AGREEMENTS

21.1    Cooperative Agreements Relating to Lands
        Near or Adjacent Unit Areas.................    16

## ARTICLE 22
### COVENANTS

22.1    Covenants Run with Land.....................    16

## ARTICLE 23
### APPEARANCES

23.1    Appearances Before Governmental
        Agencies and Authorities....................    16

## ARTICLE 24
### WAIVER

24.1    Waiver of Certain Remedies..................    17

## ARTICLE 25
### SEVERABILITY

25.1    Severability of Terms or Provisions.........    17

## ARTICLE 26
### SIGNING, RATIFICATION, OR APPROVAL

26.1    Representations.............................    17
26.2    Original, Counterparts or Ratifications.....    17
26.3    Joinder in Dual Capacity....................    17
26.4    Heirs, Successors and Assigns...............    17

## ARTICLE 27
### INTEREST OWNER RATIFICATION

27.1    Ratification and Joinder of Plan of
        Unitization Dated April 1, 1992
        Will Rogers Unit, Oklahoma County, Oklahoma..    18

PLAN OF UNITIZATION

WILL ROGERS UNIT

OKLAHOMA COUNTY, OKLAHOMA


WITNESSETH


The following shall constitute the Plan of Unitization applicable to the WILL ROGERS UNIT, Oklahoma County, Oklahoma, created pursuant to authority of Sections 287.1 - 287.15, inclusive, Title 52, Oklahoma Statutes, 1971. Its purposes are the unitized management, operation and further development of the Unitized Formation as herein defined, all to the end that a greater ultimate recovery of Oil and Gas may be had therefrom, that waste be prevented, and the correlative rights of the respective owners be protected.

ARTICLE 1
DEFINITIONS

As used in this Plan of Unitization, the terms herein shall have the following meaning:

1.1   UNIT means the WILL ROGERS UNIT, Oklahoma County, Oklahoma.

1.2   UNIT AREA means all lands committed to this Plan of Unitization; such Unit Area is identified by Tracts shown on Exhibit A and described in Exhibit B. Said exhibits may be modified to reflect changes in the Unit Area as provided in Article 17.

1.3   UNITIZED FORMATION means those common sources of supply of Oil and Gas underlying the Unit Area, and commonly known or described as follows:

The Prue Sand, as found between the depths of 7344 feet and 7431 feet
The Skinner Sand, as found between the depths of 7431 feet and 7523 feet
in the Marathon Oil Company - Airport Trust "J" 23 #1 well, located 2280 feet from the North line and 330 feet from the East line of the NE/4 of Section 23, Township 11 North, Range 4 West, Oklahoma County, Oklahoma, or the stratigraphic equivalents of said zones and/or any zones in the same common source of supply as said zones.

1.4   UNITIZED SUBSTANCES (Unit Production) means all Oil and Gas within or produced from the Unitized Formation, except Oil and Gas designated as Outside Substances.

1.5   ALLOCABLE UNITIZED SUBSTANCES means Unitized Substances except Unitized Substances utilized for injection into the Unitized Formation, Unitized Substances used for fuel in Unit Operation and any Unitized Substances that are unavoidably lost or are used in conformity with good operating practices within the Unit Area for drilling, operating or other production or development purposes for the Unitized Formation. The points at which Allocable Unitized Substances are identified and measured are the outlets of the one or more tank batteries which are located within the Unit Area where such Allocable Unitized Substances are available for delivery to the respective owners thereof.

1

1.6  OIL AND GAS means oil and gas as such in combination one with the other, and includes oil, gas, casinghead gas, casinghead gasoline, condensate, or other hydrocarbons or associated minerals, or any combination or combinations thereof.

1.7  WORKING INTEREST is an interest in Allocable Unitized Substances by virtue of a lease, operating agreement, fee title, or otherwise, which interest is chargeable with and obligated to pay or bear, either in cash or out of production or otherwise, all or a portion of the cost of drilling, developing, producing and operating Unitized Substances. The owner of Oil and Gas Rights that are free of a lease or other instrument conveying the Working Interest to another shall be regarded as a Working Interest to the extent of seven-eighths (7/8ths) of its interest in Allocable Unitized Substances, and as a Royalty Owner with respect to its remaining one-eighth (1/8th) interest therein.

1.8  ROYALTY INTEREST is a right to or interest in any portion of the Allocable Unitized Substance or proceeds thereof other than that of a Working Interest.

1.9  ROYALTY OWNER is a Person who owns a Royalty Interest.

1.10  WORKING INTEREST OWNER, OWNER, OR LESSEE is a Person who owns a Working Interest.

1.11  OPERATING COMMITTEE is the committee formed pursuant to the Unit Operating Agreement, and consists of members as more particularly specified in Article 3 of the Unit Operating Agreement.

1.12  TRACT is a parcel of land committed to this Plan of Unitization. All initial Tracts are identified by Tract number on Exhibit A and described on Exhibit B. Additional Tracts may be committed to this Plan of Unitization as provided in Article 16 hereof and Exhibits A and B shall be modified accordingly.

1.13  UNIT OPERATING AGREEMENT is the agreement having the same Effective Date as this agreement, entitled "Unit Operating Agreement, Will Rogers Unit, Oklahoma County, Oklahoma", and executed by the Working Interest Owners. Such agreement shall govern the conduct of Unit Operations and the rights and obligations of Working Interest Owners regarding such operations.

1.14  UNIT OPERATOR is the Working Interest Owner designated by Working Interest Owners under the Unit Operating Agreement to conduct Unit Operations. The initial Unit Operator shall be Marathon Oil Company.

1.15  TRACT PARTICIPATION means the percentage described on Exhibit B for each Tract committed to this Plan of Unitization. Such percentages may be amended from time to time as new Tracts are added to the Unit Area pursuant to Article 16 hereof.

1.16  UNIT PARTICIPATION of each Working Interest Owner means that percentage which is the sum total of the percentages obtained by multiplying the Working Interest of such Working Interest Owner in each Tract by the Tract Participation of such Tract.

1.17  OUTSIDE SUBSTANCES means all substances obtained from any sources, other than the Unitized Substances, and injected into the Unitized Formation.

1.18  OIL AND GAS RIGHTS means the right to explore, develop and operate lands within the Unit Area for the production of Unitized Substances, or to share in the production so obtained or the proceeds thereof.

2

1.19 UNIT OPERATIONS means all operations conducted by the Unit Operator pursuant to this Plan of Unitization and the Unit Operating Agreement for or on account of the development and operation of the Unitized Formation for the production of Unitized Substances.

1.20 UNIT EQUIPMENT means all personal property, lease and well equipment, tank batteries, gathering pipeline systems, plants and other facilities and equipment taken over or otherwise acquired by the Unit Operator on behalf of the Working Interest Owners for use in Unit Operations pursuant to the Unit Operating Agreement.

1.21 UNIT EXPENSE means all cost, expense or indebtedness incurred by the Unit Operator pursuant to the Plan of Unitization and the Unit Operating Agreement for or on account of Unit Operations.

1.22 EFFECTIVE DATE is that date designated by the Operating Committee as the Effective Date pursuant to Article 14.3 hereof.

1.23 COMMISSION means the Corporation Commission of the State of Oklahoma.

1.24 PERSON means any individual, corporation, partnership, common law or statutory trust, association of any kind, the State of Oklahoma, or any subdivision or agency thereof acting in a proprietary capacity, guardian, executor, administrator, fiduciary of any kind, or any entity holding Oil and Gas Rights in the Unitized Formation.

1.25 SINGULAR AND PLURAL - GENDER. Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

1.26 JOINT ACCOUNT shall mean the account showing the charges paid and credits received in the conduct of the Unit Operations and which are to be shared by the Working Interest Owners.

1.27 PHASE is the period of time in which certain Tract Participations are in effect as defined by Exhibit B.

### ARTICLE 2
### EXHIBITS

2.1 EXHIBITS. Attached hereto are the following exhibits which are made a part of this Plan of Unitization and incorporated herein by reference.

2.1.1 EXHIBIT A, which is a map that shows the boundary lines of the Unit Area and the Tracts therein.

2.1.2 EXHIBIT B, which is a schedule that describes each Tract in the Unit Area and shows its Tract Participation.

2.2 REFERENCE TO EXHIBITS. When reference is made to an exhibit, it is to the exhibit as originally attached or, if revised, to the last revision.

2.3 CORRECTING ERRORS. The shapes and descriptions of the respective Tracts have been established by using the best information available. If it subsequently appears that any Tract, because of diverse royalty or working interest ownership on the Effective Date, should have been divided into more than one Tract, or that any mechanical miscalculation or clerical error has been made in the preparation of Exhibits or

3

information shown thereon, Unit Operator, with the approval of
the Operating Committee, shall correct the mistake by revising
the Exhibits to conform to the facts. The revision shall not
include any re-evaluation of engineering or geological
interpretations used in determining Tract Participation. Each
such revision of an exhibit shall be effective at 7:00 a.m. on
the first day of the calendar month next following the filing
of the revised exhibit with the Secretary of the Commission,
or on such other date as may be determined by the Operating
Committee and set forth in the revised exhibit. All parties
having a right to participate in production from unit
operations shall be furnished with copies of such revised
exhibits.

## ARTICLE 3
## CREATION AND EFFECT OF UNIT

3.1 OIL AND GAS RIGHTS UNITIZED. Subject to the provisions of
this Plan of Unitization, all Oil and Gas Rights of Royalty
Owners in and to the lands described in Exhibit B, and all Oil
and Gas Rights of Working Interest Owners in and to said
lands, are hereby unitized insofar as the respective Oil and
Gas Rights pertain to the United Substances, so that Unit
Operations may be conducted as if the Unitized Substances had
been included in a single lease executed by all Royalty
Owners, as lessors, in favor of all Working Interest Owners,
and as if the lease had been subject to all of the provisions
of this Plan of Unitization.

3.2 PERSONAL PROPERTY EXCEPTED. Subject to the provisions of the
Unit Operating Agreement, all lease and well equipment,
materials, and other facilities heretofore or hereafter placed
by any of the Working Interest Owners on the lands covered
hereby and not designated as Unit Property under the Unit
Operating Agreement, shall be deemed to be and shall remain
personal property belonging to and may be removed by the
Working Interest Owners. The rights and interests therein as
among Working Interest Owners are set forth in the Unit
Operating Agreement.

3.3 AMENDMENT OF LEASES AND OTHER AGREEMENTS. The provisions of
the various leases, agreements, division and transfer orders,
or other instruments covering the respective Tracts or the
production therefrom are amended to the extent necessary to
make them conform to the provisions of this Plan of
Unitization, but otherwise shall remain in effect.

The division orders shall cover and apply to that fraction of
the Unitized Substances as is allocated to the respective
Tracts in Exhibit B (effective as of the Effective Date of the
Unit) and purchasers of Unitized Substances are authorized to
pay therefore in accordance with the applicable percentages
set forth in Exhibit B.

3.4 CONTINUATION OF LEASES AND TERM ROYALTIES. All Unit
Operations, including, but not limited to, the commencement,
drilling or operation of a well upon any part of the Unit Area
shall be deemed for all purposes, except for the purpose of
determining payments to Royalty Owners, as operations upon or
production from each Tract by the several owners thereof, and
such operations or production shall constitute compliance with
and continue in effect each lease, or term mineral or royalty
interest, or other agreement pertaining to the development of
the Unitized Formation, as to all lands covered thereby, just
as if such operations had been conducted and a well had been
drilled on and was producing from each Tract.

3.5 TITLES NOT TRANSFERRED. Nothing contained in this Plan shall
be construed to require or result in a transfer of any part of

4

the title of any Person to the Oil and Gas Rights in any Tract, nor shall the Unit be regarded as owning any of the Unit Production. All property, whether real or personal, which the Unit may in any way acquire, hold or possess, shall not be acquired, held or possessed by the Unit for its own account, but shall be so acquired, held or possessed by the Unit for the account and benefit of the several Working Interest Owners within the Unit Area and shall be owned by such Working Interest Owners in undivided interests, in accordance with their respective percentages of Unit Participation, subject, however, to the right of the Unit Operator to the possession, management, use or disposal of the same in the proper conduct of its affairs, and subject to any lien the Unit or the Unit Operator may have thereon to secure the payment of Unit Expense.

3.6   <u>DEVELOPMENT OBLIGATION</u>. Nothing herein shall relieve the Working Interest Owners from the obligation to develop reasonably as a whole the lands and leases subject hereto.

3.7   <u>INJECTION RIGHTS</u>. Royalty Owners hereby grant Working Interest Owners, subject to the provisions of Article 20 herein, the right to inject into the Unitized Formation any substances or material, including Outside Substances, in whatever amounts Working Interest Owners deem expedient for Unit Operations. Royalty Owners further grant Working Interest Owners the right to use any existing, abandoned or plugged wells, and the right to drill new wells in the Unitized Formation, to be used as injection wells, withdrawal wells, observation wells, or wells for any other purpose, in connection with the Working Interest Owners' operations in the Unitized Formation.

### ARTICLE 4
### PLAN OF OPERATION

4.1   <u>UNIT OPERATOR</u>. Marathon Oil Company is hereby designated as the initial Unit Operator. Unit Operator shall have the exclusive right to conduct Unit Operations, which shall conform to the provisions of this agreement, and the Unit Operating Agreement. If there is any conflict between such agreements, this agreement shall govern.

4.2   <u>OPERATING METHODS</u>. To the end that the quantity of Unitized Substances ultimately recoverable may be increased and waste prevented, the Unit Operator under direction of the Operating Committee, shall, with diligence and in accordance with good engineering and production practices, conduct a secondary recovery operation by means of injecting gas, water or other substances, or combinations thereof, into the Unitized Formation, and/or conduct any other producing operation calculated to enhance the recovery of hydrocarbons.

4.3   <u>CHANGE OF OPERATING METHODS</u>. Nothing herein shall prevent the Operating Committee from discontinuing or changing in whole or in part any method of operation which, in its opinion, is no longer in accord with good engineering or production practices. Other methods of operation may be conducted or changes may be made by the Operating Committee from time to time if determined by it to be feasible, necessary, or desirable to increase the ultimate recovery of Unitized Substances.

4.4   <u>COOPERATIVE AGREEMENTS</u>. The Operating Committee, with prudent practices in the interest of conservation and to increase the recovery of Unit Production, may authorize and empower the Unit Operator to execute in their behalf, agreements with the owners of working interest in lands outside the Unit Area for cooperative development, operation, injection or similar

programs with respect to the equivalent of the Unitized Formation outside the Unit Area. Any such agreement shall make provision for the drilling or conversion, equipping and operating of compensating fluid injection wells in the Unitized Formation and adjoining equivalent of the Unitized Formation outside the Unit Area. Any such agreement shall in no way affect or alter the percentages of participation established hereunder as to the parties hereto, nor shall the same provide for the sharing or allocation of production as between the Unit Area, as herein defined, and any outside lands.

### ARTICLE 5
### ALLOCATION OF UNITIZED SUBSTANCES

5.1  TRACT PARTICIPATION.  The Tract Participation of each Tract is shown in Exhibit B.  The Tract Participation of each Tract is and shall be calculated using the formula shown in Exhibit B.

5.2  RELATIVE TRACT PARTICIPATIONS.  If the Unit Area is enlarged or reduced, the revised Tract Participations of the Tracts remaining in the Unit Area and which were within the Unit Area prior to the enlargement or reduction shall remain in the same ratio one to another.

5.3  ALLOCATIONS TO TRACTS.  Allocable Unitized Substances shall be allocated to the several Tracts in accordance with the respective Tract Participations.  The amount of Unitized Substances allocated to each Tract, regardless of whether it is more or less than the actual production of Unitized Substances from the well or wells, if any, on such Tract, shall be deemed for all purposes to have been produced from such Tract.

5.4  DISTRIBUTION WITHIN TRACTS.  The Allocable Unitized Substances allocated to each Tract shall be distributed among, or accounted for to the Persons entitled to share in the production from such Tract in the same manner, in the same proportions, and upon the same conditions as they would have participated and shared in the production from such Tract, or in the proceeds thereof, had this Plan of Unitization not been adopted, and with the same legal effect.  If any Oil and Gas Rights in a Tract are or become divided and owned in severalty as to different parts of the Tract, the owners of the divided interest, in the absence of any agreement providing for a different division, shall share in the Unitized Substances allocated to the Tract, or in the proceeds thereof, in proportion to the surface acreage of their respective parts of the Tract.  The owner of Oil and Gas Rights that are free of lease or other instrument conveying the Working Interest to another shall be regarded as a Working Interest to the extent of seven-eighths (7/8ths) of its interest in Allocable Unitized Substances, and as a Royalty Owner with respect to its remaining one-eighth (1/8th) interest therein.

5.5  TAKING UNITIZED SUBSTANCES IN KIND.  Subject to any previously existing contracts or agreements affecting disposition of the Unitized Substances, each Working Interest Owner shall have the right to take in kind or separately dispose of its proportionate share of all Allocable Unitized Substances produced from the Unit Area.  Any extra expenditure incurred in the taking in kind or separate disposition by any Working Interest Owner of its proportionate share of the production shall be borne solely by such Working Interest Owner.  The Allocable Unitized Substances allocated to each Tract shall be delivered in kind to the respective Working Interest Owners entitled thereto by virtue of the ownership of Oil and Gas Rights therein or by purchase from such owner.  Subject to the provisions of Article 20, such Working Interest Owners

6

or the purchasers of the Allocable Unitized Substances, shall
have the right to construct, maintain, and operate within the
Unit Area all necessary facilities for that purpose, provided
that they are so constructed, maintained, and operated as not
to interfere with Unit Operations. Any extra expenditures
incurred by Unit Operator by reason of the delivery in kind of
any portion of the Allocable Unitized Substances shall be
borne by the receiving Working Interest Owner. If a Royalty
Owner has the right to take in kind a share of Allocable
Unitized Substances and fails to do so, the Working Interest
Owner of such Royalty Owner shall be entitled to take in kind
such share of the Allocable Unitized Substances.

5.6    FAILURE TO TAKE IN KIND. If any Working Interest Owner fails
to take in kind or separately dispose of its share of
Allocable Unitized Substances, Unit Operator shall have the
right, but not the duty to purchase for its own account or
sell to others such share; provided that, all contracts of
sale by Unit Operator of any other Working Interest Owner's
share of Allocable Unitized Substances shall be only for such
reasonable periods of time as are consistent with the minimum
needs of the industry under the circumstances, but in no event
shall any such contract be for a period in excess of one (1)
year.      The proceeds of the sale of Allocable Unitized
Substances so disposed of by Unit Operator shall be paid to
the Working Interest Owner entitle thereto.

5.7    RESPONSIBILITY FOR ROYALTY SETTLEMENTS. Any Working Interest
Owner receiving in kind or separately disposing of all or part
of the Allocable Unitized Substances allocated to any Tract or
receiving the proceeds therefrom shall be responsible for the
payment thereof to the Persons entitled thereto, and shall
indemnify all other Persons including Unit Operator, against
any liability for all royalties, overriding royalties,
production payments, net profits interest and all other
payments chargeable against of payable out of such Allocable
Unitized Substances or the proceeds therefrom. In the event
the Unit Operator undertakes for any Working Interest Owner to
sell or to make payments of royalties, overriding royalty
payments, production payments, or any other payment chargeable
against or payable out of such Allocable Unitized Substances
or the proceeds therefrom, any such Working Interest Owner
shall indemnify, save and hold harmless Unit Operator from and
against any claims, damages, loss or judgment arising out of
the activities of Unit Operator with respect to such
transactions.

5.8    SLIDING SCALE ROYALTY. Any royalty or other payment which
varies, under the terms of the instrument creating it,
according to actual production from a Tract or according to
the capability of the well or wells located thereon to
produce, shall on and after the Effective Date hereof be
computed upon that portion of the Allocable Unitized
Substances allocated to the particular Tract and not upon the
actual production of Oil and Gas from the Tract or the
capability of the well or wells located thereon to produce.
If any such royalty or other payment depends on the production
or pipeline runs from a well, such production or pipeline runs
shall be determined by dividing the Allocable Unitized
Substances allocated to the Tract by the number of wells
located thereon that were capable of producing as of the
Effective Date hereof. For the purpose of this provision, any
Tract without such a producing well as of the Effective Date
shall be deemed to have one (1) such well.

ROYALTY ON OUTSIDE SUBSTANCES. No payments shall be due or
payable to Royalty Owners with respect to any Outside
Substances produced from the Unitized Formation.

5.9.1    GAS. If Gas is the Outside Substance injected, fifty

7

percent (50%) of any Gas subsequently produced from the Unitized Formation and sold, or used for other than Unit Operations, shall be deemed to be the Outside Substance so injected until the total volume thereof equals the total volume of the Outside Substance so injected.

5.9.2 LIQUID HYDROCARBONS. If liquid hydrocarbons are the Outside Substance injected and the Allocable Unitized Substances subsequently produced contain such liquid hydrocarbons as determined by the Operating Committee by applicable tests, then commencing on the first day of the calendar month following such a determination, one hundred percent (100%) of all liquid hydrocarbons attributable to each Tract and sold during any month shall be deemed to be Outside Substance so injected until the volume thereof equals the total volume of the Outside Substance so injected.

5.9.3 OTHER. If other Outside Substances are injected and the Allocable Unitized Substances subsequently produced contain such other Outside Substances as determined by the Operating Committee by applicable tests, then commencing on the first day of the calendar month following such a determination, one hundred percent (100%) of any Outside Substance subsequently produced from the Unitized Formation and sold or used for other than Unit Operations shall be deemed to be the Outside Substance so injected until the total volume thereof equals the total volume of the Outside Substance so injected.

5.10 OWNERSHIP OF OUTSIDE SUBSTANCES. Unit Operator upon direction of Unit Operating Committee shall procure Outside Substances for injection into the Unitized Formation for pressure maintenance purposes. All costs to procure such Outside Substances shall be considered costs of Unit Operations and shall be borne by the Working Interest Owners in accordance with their Unit Participation percentage. Cost of disposal of Outside Substance produced from the Unitized Formation shall be considered a cost of Unit Operations and shall be borne by the Working Interest Owners in accordance with their Unit Participation percentage. The proceeds of any Outside Substances sold shall be distributed to the Working Interest Owners in accordance with their Unit Participation percentage.

## ARTICLE 6
### USE OR LOSS OF UNITIZED SUBSTANCES

6.1 USE OF UNITIZED SUBSTANCES. Unit Operator may use or consume as much of the Unitized Substances as it deems necessary for Unit Operations, including but not limited to the injection thereof into the Unitized Formation.

6.2 ROYALTY PAYMENTS. No royalty, overriding royalty, production, or other payments shall be payable upon, or with respect to, Unitized Substances used or consumed in Unit Operations or which otherwise may be lost or consumed in the production, handling, treating, transportation, or storing of Unitized Substances.

## ARTICLE 7
### PRODUCTION AS OF THE EFFECTIVE DATE

7.1 OIL OR LIQUID HYDROCARBONS IN LEASE TANKS. Unit Operator shall gauge or otherwise determine the amount of merchantable Unitized Substances that are in lease tanks as of 7:00 a.m. on the Effective Date. Oil or other liquid hydrocarbons in

8

treating vessels, separation equipment, and tanks below pipeline connections shall not be considered merchantable. Any such merchantable Oil or other liquid hydrocarbons not promptly removed may be sold by the Unit Operator for the account of the Working Interest Owners entitled thereto who shall pay royalty due thereon under the provisions of the applicable leases or other contracts.

7.2    OVERPRODUCTION.  If, as of the Effective Date hereof, any Tract is overproduced with respect to the allowable, as set by any governmental body, of the wells on that Tract, and the amount of overproduction has been sold or otherwise disposed of, such overproduction shall be charged against such Tract as having been delivered to the Persons entitled to Unitized Substances allocated to such Tract.

ARTICLE 8
TITLES

8.1    ~~TITLE INFORMATION.  In the event of a questionable title, and upon request of the Operating Committee, the Working Interest Owners of a Tract shall furnish and make available to the Operating Committee or the Unit Operator an abstract or title opinion brought to the date of the request, as may be required by the Operating Committee, together with all other title information in the possession of such Working Interest Owners, affecting their title and that of their Royalty Owners to the Oil and Gas Rights in and to such Tract.~~

8.2    ~~WARRANTY AND INDEMNITY.  Each Person who may claim to own a Working Interest or Royalty Interest in and to any Tract or the Unitized Substances allocated thereto, shall be deemed to have warranted its title to such interest, and, upon receipt of the Unitized Substances or the proceeds thereof to the credit of such interest, shall indemnify and hold harmless all other Persons in interest from any loss due to failure, in whole or in part, of its title to any such interest; provided that, such indemnity shall be limited to an amount equal to the net value that has been received from the sale or receipt of Unitized Substances attributed to the interest as to which title failed.  Each failure of title will be deemed to be effective, insofar as this Plan of Unitization is concerned, as of the first day of the calendar month in which such failure is finally determined, and there shall be no retroactive adjustment of Unit Expense, or retroactive allocation of Unitized Substances or the proceeds therefrom as a result of title failure.~~

8.3    ~~PRODUCTION WHERE TITLE IS IN DISPUTE.  If the title or right of any Person claiming the right to receive in kind all or any portion of the Unitized Substances allocated to a Tract is in dispute, Unit Operator at the direction of the Operating Committee, shall either:~~

~~a. require that the Person to whom such Unitized Substances are delivered or to whom the proceeds thereof are paid, furnish security for the proper accounting therefor to the rightful owner if the title or right of such Person fails in whole or in part; or,~~

~~b. withhold and market the portion of the Unitized Substances with respect to which title or right is in dispute, and impound the proceeds thereof until such time as the title or right thereto is established by a final judgment of a court of competent jurisdiction or otherwise to the satisfaction of the Operating Committee, whereupon the proceeds so impounded shall be paid to the Person rightfully entitled thereto.~~

8.4    PAYMENT OF TAXES.  The Unit Operator shall render for

9

assessment and pay or cause to be paid for the account of all
Working Interest Owners and their respective Royalty Owners,
the Oil and Gas severance taxes, ad valorem taxes based on Oil
and Gas production and conservation taxes (collectively
referred to as "taxes"). Any taxes so paid by the Unit
Operator shall be charged to the accounts of the Working
Interest Owners in proportion to their participation in the
production of Allocable Unitized Substances or in the gross or
net proceeds thereof under this agreement or as may be
provided by applicable law. Unit Operator shall charge the
proper proportion of said taxes to the Royalty Owners for
whose account said taxes had been paid, and may currently
retain and deduct sufficient Allocable Unitized Substances, or
the proceeds thereof, from each such Royalty Owner's shares to
secure reimbursement for the taxes so paid.

8.5  PAYMENT OF TAXES TO PROTECT TITLE. If any taxes are not paid
when due by or for any owner of surface rights to lands within
the Unit Area, or severed mineral interest or Royalty
Interests in such lands, or lands outside the Unit Area on
which Unit Equipment is located, Unit Operator may, with
approval of the Operating Committee at any time prior to tax
sale, or expiration of period of redemption after tax sale,
pay the tax and redeem or purchase such rights, interests, or
property. Any such payment shall be an item of Unit Expense.
Unit Operator shall, if possible, withhold from any proceeds
derived from the sale of Unitized Substances otherwise due any
delinquent taxpayer an amount sufficient to defray the costs
of such payment, such withholding to be credited to Working
Interest Owners. Such withholding shall be without prejudice
to any other remedy available to Unit Operator or Working
Interest Owners.

8.6  TRANSFER OF TITLE. Any conveyance of all or any part of any
interest owned by a Person with respect to any Tract shall be
subject to this agreement. Any such conveyance of all or any
part of such interest shall not be effective until the
transferee agrees in writing and is actually able to assume
all duties, obligations, and liabilities of this agreement.
No change of title shall be binding upon Unit Operator, or
upon any Person other than the Person so transferring, until
7:00 a.m. on the first day of the calendar month next
succeeding the date of receipt by Unit Operator of a photocopy
or a certified copy of the recorded instrument evidencing such
change in ownership if such receipt is prior to the fifteenth
day of the month received. If receipt by Unit Operator is
after the fifteenth day of the month, the transfer shall be
effective at 7:00 a.m. the first day of the second succeeding
calendar month.

## ARTICLE 9
## EASEMENTS OR USE OF SURFACE

9.1  GRANT OF EASEMENTS. Subject to the provisions of Article 20,
herein, the Unit and Unit Operator shall have the right to use
as much of the surface of the land within the Unit Area as may
be reasonably necessary for Unit Operations, including, but
not limited to, the right at any time and from time to time to
lay, construct, repair, maintain, operate and use pipelines,
power and communication lines and poles, roads, reservoirs,
tanks and earthen pits and to remove, at any time and from
time to time, any and all such property and fixtures,
including casing in wells, erected or placed on the Unit Area
by the Unit Operator or Lessees; provided, nothing herein
shall be construed as leasing or otherwise conveying to the
Unit a site for a water, gas injection, processing or other
plant, or camp site.

9.2  USE OF WATER. Subject to the provisions of Article 20,

10

herein, the Unit shall have free use of all water from the Unit Area for Unit Operations, including the right to drill salt water supply wells, provided that, Unit Operator shall not use fresh water from the Unit Area unless acquired by separate contract with the rightful owners of the fresh water. The Unit may convert any existing or future completed, dry, or abandoned wells in the Unit Area to salt water, supply, injection or disposal wells. Unit Operator shall not use water from any well, lake, pond or irrigation ditch of a landowner without consent of the landowner.

9.3   SURFACE DAMAGES.  The Unit shall pay the rightful owners for *damages*, as required under existing oil and gas leases, written agreements or any applicable state statutes, to the surface of the Unit Area that result from Unit Operations.

9.4   AIRPORT LEASE.  Committed to this Plan of Unitization is a Lease from the Oklahoma City Trust and the City of Oklahoma City, Oklahoma dated July 1, 1980 ("Airport Lease").  Said Lease covers a substantial portion of the Will Rogers World Airport Area. Due to the Federal, State and City requirements which must be met regarding drilling and production operations on or near airport locations, the terms of this Lease dealing with such requirements will be made a stipulated provision of this Plan as follows:

Inclusion under the Plan of Unitization of the "Airport Lease" will not have the effect of waiving, abandoning, changing or altering any requirement, provision, or stipulation contained therein relating to the Lessee's conduct of any and all operations and activities on the parcel or tract covered by said "Airport Lease", including, without limiting the generality thereof, (i) the location of wells or facilities of whatsoever nature on said parcel or tract; (ii) the conduct of all operations, drilling, and/or other activities of any kind or character on said parcel or tract; (iii) the approvals and consents which must be obtained prior to the location of wells or other facilities on such parcel or tract, or prior to the conduct of any operations of activities on the parcel or tract (all such Lease requirements, provisions, or stipulations hereinafter collectively referred to as "Operational Covenants").  Any Unit Operator under this Plan of Unitization conducting any such operations or activities on any parcel or tract, covered by the "Airport Lease" shall, as to such parcel or tract, comply with all operational covenants contained therein in the same manner and to the same extent as if such Unit Operator were the Lessee under the "Airport Lease".

## ARTICLE 10
## INDIVIDUAL RELATIONSHIPS AND RIGHTS

10.1   NO PARTNERSHIP.  The duties, obligations, and liabilities of the Working Interest Owners shall be several and not joint or collective.  This Plan of Unitization is not intended to create, and shall not be construed to create, an association or trust, or to impose a partnership duty, fiduciary duty, obligation, or liability with regard to any one or more of the Working Interest Owners.  Each Working Interest Owner shall be individually responsible for its own obligations as herein provided.

10.2   NO SHARING OF MARKET.  Nothing herein shall be construed to provide, directly or indirectly, for any cooperative refining, joint sale, or marketing of Unitized Substances.

10.3   INFORMATION TO ROYALTY OWNERS.  Each Royalty Owner shall be

11

entitled to receive the information from the Working Interest Owner to which such Royalty Owner is entitled by an existing agreement.

## ARTICLE 11
## GENERAL POWERS OF UNIT OPERATOR

11.1 GENERAL POWERS OF UNIT OPERATOR. The Unit Operator is authorized for the account of all owners of Oil and Gas Rights within the Unit Area to supervise and conduct the further development and operation of the Unit Area for the production of Unitized Substances, pursuant to the powers conferred and subject to the limitations imposed by the provisions of Sections 287.1 — 287.15, inclusive, Title 52, Oklahoma Statutes 1971, or any amendment thereof and by this Plan of Unitization.

## ARTICLE 12
## FORCE MAJEURE

12.1 FORCE MAJEURE. All obligations arising hereunder, except for the payment of money, shall be suspended while compliance is prevented, in whole or in part, by a labor dispute, fire, war, civil disturbance, act of God; by Federal, state, or municipal laws; by any rule, regulation, or order of a governmental agency; by inability to secure materials; or by any other cause or causes, whether similar or dissimilar, beyond reasonable control of the Person. No Person shall be required against its will to adjust or settle any labor dispute. Neither this agreement nor any lease or other instrument subject hereto shall be terminated by reason of the suspension of Unit Operations due to any one or more of the causes set forth in this Article.

## ARTICLE 13
## NOTICES

13.1 NOTICES. All notices required hereunder shall be in writing and shall be deemed to have been properly served when sent by mail, telegram or other means to the address of the representative of each Working Interest Owner on the Operating Committee as furnished to Unit Operator in accordance with Article 3.1 of the Unit Operating Agreement.

13.2 NOTICE OF TRANSFER OF TITLE. No change of title shall be binding on the Unit or Unit Operator until the first day of the calendar month next succeeding the date of receipt by Unit Operator of evidence satisfactory to it of such change in ownership if such receipt is prior to the fifteenth day of the month received. If such receipt is after the fifteenth day of such month, the transfer shall be effective at 7:00 a.m. the first day of the second succeeding calendar month. Each such transfer, assignment or conveyance whether so stating or not, shall operate to impose upon the Person or Persons acquiring such interest the obligation of the predecessor in interest with respect to the interest so transferred and shall likewise operate to give and grant to the Person or Persons acquiring such interest all benefits attributable hereunder to such interest.

## ARTICLE 14
## ORGANIZATION AND EFFECTIVE DATE

14.1 DESIGNATION OF REPRESENTATIVES. Each Working Interest Owner represented on the Operating Committee shall inform Unit Operator in writing of the names and addresses of the representative and alternate on the Operating Committee who

are authorized to represent and bind a Working Interest Owner with respect to Unit Operations. The representative or alternate may be changed from time to time by written notice to Unit Operator.

14.2 ORGANIZATIONAL MEETING. Subject to call by the Working Interest Owner designated herein as the Unit Operator, the representatives designated by the Working Interest Owners shall meet to perfect the organization of the Operating Committee. The meeting may be held at any time after twenty (20) days from the entry of the order of the Commission approving the Unit. Notice of the time and place of the meeting shall be mailed at least ten (10) days prior thereto to all Working Interest Owners within the Unit Area whose names and addresses are known to the Unit Operator, as well as those Working Interest Owners who, within ten (10) days from the date of the order, have notified the Secretary of the Commission in writing of their desire to be notified of the meeting.

14.3 EFFECTIVE DATE. The Operating Committee shall determine, and give Working Interest Owners reasonable notice of, the date when the Unit Operator will take over and commence Unit Operations, said date will be the Effective Date for the purpose of this agreement. The Effective Date shall not be less than fifteen (15) days from the entry of the order approving the Unit or more than six (6) months after the time when the order approving the Unit becomes final.

14.4 ORDERS APPROVING UNIT - WHEN FINAL. The order of the Commission approving the Unit means the order or orders approving this Plan of Unitization and finding that it has been signed, ratified, or approved by Working Interest Owners and Royalty Owners owning the percentage interest in the Unit Area required to make it effective. If the approval of this Plan of Unitization and the finding of approval by the Working Interest Owners and Royalty Owners are by separate order, the date of the later of the two (2) orders shall be regarded as the date of entry of the order approving the Unit. The order approving the Unit will be regarded as having become final when the time for appeal from the action of the Commission in regard thereto has expired, if no appeal is taken; or, if an appeal or appeals are taken, then upon the final determination thereof.

14.5 NONAPPROVAL OF PLAN OF UNITIZATION BY COMMISSION. If an order of the Commission approving the Unit has not been entered prior to July 1, 1993, then this Plan of Unitization shall terminate on that date, hereinafter called termination date, and thereafter be of no further effect, unless prior thereto this Plan of Unitization has been signed, ratified, or approved by three (3) or more Working Interest Owners owning a combined Unit Participation of at least sixty-three percent (63%), and such working Interest Owners owning a combined Unit Participation of at least sixty-three percent (63%) elect to extend the termination date for a period not to exceed one (1) year. If the termination date is so extended and an order of the Commission approving the Unit is not entered on or before the extended termination date, this Plan of Unitization shall terminate on the extended termination date and thereafter be of no further force and effect.

14.6 FAILURE TO TAKE OVER OPERATIONS. If the Unit Operator fails to take over and commence Unit Operations on or before six (6) months after the time when the order of the Commission approving the Unit becomes final, the Unit shall be dissolved and all rights and obligations under this Plan of Unitization shall be at an end, except that any and all cost and expense incurred incident to its organization, or preparatory to the commencement of Unit Operations, not to exceed $50,000 unless

13

approved by the Operating Committee, shall be borne and paid for by the Working Interest Owners whose representatives authorized the incurring of such expenses, in proportion that the Unit Participation of each such Working Interest Owner bears to the total Unit Participation of all such Working Interest Owners. If Unit Operator on his own accord fails to commence unit operations, then no reimbursement shall occur as provided for under this paragraph.

14.7 CERTIFICATE OF EFFECTIVENESS. The Unit Operator, within a reasonable period of time after the Effective Date hereof, shall submit to the County Clerk of Oklahoma County, Oklahoma, and to the Secretary of the Commission, for filing, a certificate of effectiveness signed by the Chairman of the Operating Committee, setting forth:

a. the hour, day and year on which the Unit took over and commenced Unit Operations;

b. a description or plat of the lands included within the Unit Area; and,

c. the cause, number and state of the Commission order approving this Plan of Unitization.

ARTICLE 15
TERM

15.1 TERM. This agreement shall remain in effect so long as Unitized Substances are produced in paying quantities, unless sooner terminated by:

a. Working Interest Owners owning a combined Unit Participation of sixty-three percent (63%) or more whenever such Working Interest Owners determine that Unit Operations are no longer economically feasible, or

b. operation of other provisions in this agreement.

15.2 EFFECT OF TERMINATION. Upon termination of this agreement, the further development and operation of the Unitized formation as a Unit shall cease. The relationships among owners of Oil and Gas Rights shall thereafter be governed by the terms and provisions of the leases and other instruments, not including this agreement, affecting the separate Tracts. Upon termination of this agreement in the manner set out herein, the Royalty Owners agree to a one hundred eighty (180) day extension of their leases and contracts covering the lands which are committed to the Unit Area to permit the Working Interest Owners holding such lands to resume operations thereof and if so resumed, such lease or contract shall remain in full force and effect in accordance with the provisions thereof.

15.3 SALVAGING EQUIPMENT UPON TERMINATION. If not otherwise granted by the lease or other instruments affecting the separate Tracts, Working Interest Owners shall have a period of six (6) months after the date of termination of this agreement within which to salvage and remove Unit Equipment. All Unit Equipment upon termination shall be owned by Working Interest Owners in their Unit Participation percentages.

15.4 CERTIFICATE OF TERMINATION. When Unit Operations are abandoned and the affairs of the Unit terminated, Unit Operator shall submit to the County Clerk of Oklahoma County, Oklahoma, and to the Secretary of the Commission, for filing, a Certificate of Termination signed by the Chairman of the Operating Committee setting forth the fact and time of termination of the Unit.

14

15.5 OBLIGATION PAYABLE AFTER TERMINATION. If any liability or obligation incurred prior to termination of the Unit shall accrue and become payable thereafter, the amount shall be borne and paid as Unit Expense in the same manner as if it had accrued prior to termination of the Unit.

ARTICLE 16
AMENDMENT TO PLAN OF UNITIZATION
AND ENLARGEMENT OF UNIT

16.1 AMENDMENT AND ENLARGEMENT. Any amendment of this Plan of Unitization or any enlargement of the Unit Area shall be in accordance with the provisions of Section 287.10, Title 52, Oklahoma Statutes 1971, or any amendment thereto.

ARTICLE 17
GENERAL

17.1 AMENDMENTS AFFECTING WORKING INTEREST OWNERS. Amendments hereto relating wholly to Working Interest Owners may be made if signed by Working Interest Owners in accordance with the provisions of the Unit Operating Agreement.

17.2 ACTION BY WORKING INTEREST OWNERS. Except as otherwise provided in this agreement, any action or approval required by Working Interest Owners hereunder shall be in accordance with the provisions of the Unit Operating Agreement.

17.3 LIEN AND SECURITY INTEREST. Unit Operator shall have a lien upon and a security interest in the interests of Working Interest Owners and Working Interest Owners shall have a similar lien and security interest in the interest of Unit Operator in the Unit Area as provided in the Unit Operating Agreement.

17.4 CARVED-OUT INTEREST SUBJECT TO THIS AGREEMENT. In the event any Working Interest Owner shall, after executing this agreement, create an overriding royalty, production payment, net profits, or carved-out interest, or any other interest out of its interest then subject to this agreement, such carved-out interest shall be subject to the terms and provisions of this agreement. In the event the Working Interest Owner owning the interest out of which the carved-out interest was created fails to pay any Unit Expense chargeable to such Working Interest Owner under this agreement and the production to the credit of such Working Interest Owner is insufficient for that purpose, the owner of the carved-out interest will be liable for its pro rata portion of all Unit Expense for which the Working Interest Owner that created such carved-out interest would have been liable hereunder by virtue of such Working Interest Owner's entire original interest, just as though such carved-out interest had not been created. In this event, the lien provided in Section 17.3 hereof may be enforced against such carved-out interest in the same manner as the lien was enforceable against the original interest out of which the carved-out interest was created.

ARTICLE 18
CONFLICT

18.1 CONFLICT WITH UNIT OPERATING AGREEMENT. No term or provision in the Unit Operating Agreement shall be considered as an amendment of this Plan of Unitization and in the event there is a conflict between any term or provision of the Plan of Unitization and the Unit Operating Agreement, the terms and provisions of the Plan of Unitization shall prevail.

15

## ARTICLE 19
### RENTAL SETTLEMENT

19.1 <u>PAYMENT OF RENTAL OR MINIMUM ROYALTIES.</u>  Rental or minimum royalties due under leases on Unitized Land shall be paid by the Working Interest Owners responsible therefor under the terms and provisions of such leases and of any applicable existing contracts, laws and regulations.

## ARTICLE 20
### GOVERNMENTAL AUTHORITY

20.1 <u>LAWS AND REGULATIONS.</u>  This agreement is subject to all applicable valid laws, rules, regulations and orders of any governmental authority having jurisdiction, including the Federal Aviation Administration, Board of Adjustments, and City of Oklahoma City, or any subdivision thereof.  The laws, rules and regulations of the State of Oklahoma shall govern any disputes or litigations arising from this agreement.

## ARTICLE 21
### COOPERATIVE AGREEMENTS

21.1 <u>COOPERATIVE AGREEMENTS RELATING TO LANDS NEAR OR ADJACENT UNIT AREAS.</u>  The Unit Operator may enter into, amend or terminate cooperative agreements with respect to land adjacent to or near the Unit Area for the purpose of coordinating operations, subject to the approval of any final agreement by the Working Interest Owners as provided for in Article 3.6.2 of the Unit Operating Agreement.

## ARTICLE 22
### COVENANTS

22.1 <u>COVENANTS RUN WITH LAND.</u>  The covenants herein shall be construed to be covenants running with the land with respect to the interest of the Persons hereto and their successors in interest until this agreement terminates, and any grant, transfer or conveyance of an interest in land or leases subject hereto shall be and hereby is conditioned upon the assumption by the grantee, transferee or other successor in interest of all duties and obligations hereunder relating to the interest so transferred.  No assignment or transfer of any Working Interest or Royalty Interest shall be binding upon the Unit Operator until the Unit Operator is furnished with the original or a certified copy of the instrument of transfer and a written assumption of obligations hereunder by such successor in interest.

## ARTICLE 23
### APPEARANCES

23.1 <u>APPEARANCES BEFORE GOVERNMENTAL AGENCIES AND AUTHORITIES.</u>  The Unit Operator shall have the right to appear for and on behalf of any and all interests affected hereby (except as to a Person hereto that appears on its own behalf) before state and federal regulatory agencies and to appeal from orders issued under the regulations of said agencies or to apply for relief from any of said regulations or in any proceedings relative to operations before said agencies or any other legally constituted authority.  Any other Person shall also have the right, at its own expense, to appear on its own behalf and be heard in any such proceeding, and the Unit Operator shall promptly notify each such Person of any such proceedings of

which the Unit Operator has knowledge.

## ARTICLE 24
### WAIVER

24.1 WAIVER OF CERTAIN REMEDIES. Each Person executing or ratifying this agreement covenants that, during the existence of this Plan of Unitization, such Person shall not resort to any action at law or in equity to partition the Unit Area or Tract therein, any equipment or the facilities used for Unit Operations, and to that extent waives the benefit of all laws authorizing such partition.

## ARTICLE 25
### SEVERABILITY

25.1 SEVERABILITY OF TERMS OR PROVISIONS. If any terms or provisions of this agreement or any applications thereof shall be invalid or unenforceable, the remainder of this agreement and any other application of such terms or provisions shall not be affected thereby.

## ARTICLE 26
### SIGNING, RATIFICATION, OR APPROVAL

26.1 REPRESENTATIONS. Each Working Interest Owner hereby represents to each other Person executing or ratifying this agreement that the execution, delivery and performance of this agreement and of the Unit Operating Agreement will not:

a. result in a breach of or constitute a default under any assignment, contract or instrument of transfer to which such Working Interest Owner is a party or by which it or its properties and interests within the Unit Area may be presently bound or affected; or

b. violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination or award presently in effect having application to such Working Interest Owner or such properties and interests.

If any Person executing or ratifying this agreement shall be in breach of or in default under such assignment, contract or instrument of transfer or be in violation under item (b) above, such Person shall bear the entirety of all loss, damage and liability resulting therefrom and shall indemnify and hold harmless all other Persons executing or ratifying this agreement against such loss, damage and liability and shall defend such other Persons against the same.

26.2 ORIGINAL, COUNTERPARTS OR RATIFICATIONS. This Plan of Unitization may be signed, ratified, or approved by signing the original of this instrument, a counterpart, or other instrument adopting the provisions hereof, all with the same effect as if all Persons had signed the same instrument. Persons signing, ratifying, or otherwise approving this Plan of Unitization thereby agree to all the provisions hereof.

26.3 JOINDER IN DUAL CAPACITY. The signing, ratification, or approval of this Plan of Unitization as herein provided by any Person as either a Working Interest Owner or as a Royalty Owner shall commit all interests in the Unit Area that may be owned or controlled by such a Person.

26.4 HEIRS, SUCCESSORS AND ASSIGNS. The signing, ratification, or approval of this Plan of Unitization shall be binding upon the heirs, personal representatives, successors and assigns of the

17

Persons so signing, ratifying or approving the same.

## ARTICLE 27
## INTEREST OWNER RATIFICATION

27.1 **RATIFICATION AND JOINDER OF PLAN OF UNITIZATION DATED MAY 1, 1992, WILL ROGERS UNIT, OKLAHOMA COUNTY, OKLAHOMA.** The undersigned, herein designated in the singular whether one or more, represents that he, she or it, as the case may be, is a Working Interest Owner or Royalty Owner, as defined in said Plan of Unitization, in one or more of the tracts identified on Exhibit A, attached to and made a part of said Plan of Unitization. The undersigned, being familiar with the contents thereof, desires to ratify, approve and confirm said Plan of Unitization.

NOW, THEREFORE, the undersigned does hereby ratify, approve, confirm and adopt said Plan of Unitization fully and with the same effect as if the undersigned had executed and delivered said Plan of Unitization, and does hereby unitize and pool all rights and interest of the undersigned in and to the lands situated within the Unit Area in the same manner and to the same extent as provided in said Plan of Unitization and subject to all of the terms, conditions, covenants, and provisions contained in said Plan of Unitization.

Executed this 25th day of _____ June _____, 19 92.

Attest: (If a Corporation)      COMPANY: Marathon Oil Company

By: _____      By: _____

Title: _____      R. G. Becker

Title: Attorney-in-Fact

OKLAHOMA CITY AIRPORT TRUST

ATTEST (SEAL)

Secretary

Ken W. Townsend, Chairman

Approved by the Council of the City of Oklahoma City this 27 day of October, 1992.

CITY OF OKLAHOMA CITY

ATTEST (SEAL)

City Clerk

Ronald J. Norick, Mayor

WILL ROGERS UNIT

18

The foregoing Plan of Unitization as amended is approved as to form and legality this 21 day of October, 1992.

_____
Assistant Municipal Counselor

STATE OF __Oklahoma__ )
                       )
COUNTY OF __Oklahoma__ )

The foregoing Ratification of Plan of Unitization, Will Rogers Unit, Oklahoma County, Oklahoma, was acknowledged before me this 25th day of __June__, 19 92, by __R. G. Becker__, as __Attorney-in-Fact__, on behalf of __Marathon Oil Company__ _____, a corporation.

_____
Notary Public

My Commission Expires:
__10-11-94__

STATE OF OKLAHOMA )
                  )  ss.
COUNTY OF OKLAHOMA )

The foregoing Ratification of Plan of Unitization, Will Rogers Unit, Oklahoma County, Oklahoma, was acknowledged before me this 22 day of October, 1992 by Ken W. Townsend, Chairman and Trustee of the Oklahoma City Airport Trust, a public trust, on behalf of the Trust.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal the day and year aforesaid.

_____

(SEAL)
My Commission Expires:
__April 1, 1996__

STATE OF OKLAHOMA )
                  )  ss.
COUNTY OF OKLAHOMA )

The foregoing Ratification of Plan of Unitization, Will Rogers Unit, Oklahoma County, Oklahoma, was acknowledged before me this 27 day of October, 1992 by Ronald J. Norick, Mayor of The City of Oklahoma City, a municipal corporation on behalf of The City.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal the day and year aforesaid.

_____

(SEAL)
My Commission Expires:
__April 1, 1996__

19



EXHIBIT 'A'

WILL ROGERS UNIT

EXHIBIT "B"
WILL ROGERS UNIT
OKLAHOMA COUNTY, OKLAHOMA

The relative participation of the Tracts in the proposed Will Rogers Unit shall
be based on the following Participation Formula:

Phase I:    Phase I Tract Participation Percentages shall be based on the
parameter weighting of:

| | |
|---|---|
| 1% | Frue Zone Hydrocarbon Pore Volume |
| 30% | Remaining oil reserves as of January 1, 1992 for all zones open to produce |
| 30% | Remaining gas reserves as of January 1, 1992 for all zones open to produce |
| 10% | Average monthly oil production from all zones open to produce, July-December 1991 |
| 30% | Average monthly gas production from all zones open to produce, July-December 1991 |
| 9.5% | Average monthly oil production, actual or estimated from the Frue zone, July-December 1991 |
| 9.5% | Average monthly gas production, actual or estimated from the Frue zone, July-December 1991 |

Phase I shall be in effect until the first day of the month after 301,816 barrels
of oil have been produced from the Unitized Formation underlying the Unit Area
after January 1, 1992, after which Phase II shall become effective.

Phase II:    Phase II Tract Participation Percentages shall be based on the
parameter weighting of:

| | |
|---|---|
| 30% | Frue Zone Hydrocarbon Pore Volume |
| 2% | Skinner Zone Hydrocarbon Pore Volume |
| 10% | Well Ultimate Oil Production |
| 8% | Well Ultimate Gas Production |
| 50% | Frue Zone Ultimate Oil Production |

Phase II shall be in effect from the date Phase I Tract Participation Percentages
cease to be in effect until termination of the Unit.

| | Tract | Description | Phase I Percent | Phase II Percent |
|---|---|---|---|---|
| 1 | APT J-27 | S2 NW Sec. 27-11N-4W | 5.1953743 | 2.0732420 |
| 2 | APT B-27 | SW NE Sec. 27-11N-4W | 0.3493840 | 1.2835874 |
| 3 | APT D-27 | NW NW Sec. 27-11N-4W | 0.7952564 | 0.9008700 |
| 4 | APT C-27 | NE NW Sec. 27-11N-4W | 1.6530190 | 0.9326639 |
| 5 | APT F-27 | NW NE & SE NE Sec. 27-11N-4W | 0.0449375 | 1.0039731 |
| 6 | APT 27-1 | NE NE Sec. 27-11N-4W | 2.0312358 | 3.3655732 |
| 7 | APT D-26 | S2 NW Sec. 26-11N-4W | 0.3589997 | 0.8575937 |
| 8 | APT D-26 | NW NE & S2 NE Sec. 26-11N-4W | 3.0830111 | 2.6435605 |
| 9 | APT 26-1 | NW NW Sec. 26-11N-4W | 1.1818085 | 2.0506471 |
| 10 | APT 26-2 | NE NW Sec. 26-11N-4W | 1.1211306 | 2.4687883 |
| 11 | APT A-26 | NE NE Sec. 26-11N-4W | 1.3722924 | 1.6381505 |
| 12 | APT 25-1 | NW Sec. 25-11R-4W | 0.3169921 | 0.4884720 |
| 13 | APT R-22 | SE Sec. 22-11N-4W | 0.6412134 | 2.0808897 |
| 14 | APT 23-1 | SW NW Sec. 23-11N-4W | 5.8024569 | 6.4046234 |
| 15 | APT X-23 | SE NW Sec. 23-11N-4W | 6.6164765 | 5.9439247 |
| 16 | APT A-23 | SW NE Sec. 23-11N-4W | 0.4041528 | 2.1520979 |
| 17 | APT K-23 | SE SE Sec. 23-11N-4W | 2.1261742 | 2.6498020 |
| 18 | APT N-23 | N2 SW Sec. 23-11N-4W | 7.4860246 | 5.2433982 |
| 19 | APT Y-23 | NW SE Sec. 23-11N-4W | 4.1358157 | 4.5773778 |
| 20 | APT P-23 | NE SE Sec. 23-11N-4W | 1.4432541 | 3.9626068 |
| 21 | APT J-23 | SW NE Sec. 23-11N-4W | 2.5084227 | 2.8382351 |
| 22 | APT C-23 | SE NE Sec. 23-11N-4W | 3.3305879 | 5.0556394 |
| 23 | APT K-23 | N2 NE Sec. 23-11N-4W | 1.2017784 | 1.0293940 |
| 24 | APT B-24 | NW SW Sec. 24-11N-4W | 2.6072245 | 2.0894360 |
| 25 | APT A-24 | SE SW Sec. 24-11N-4W | 0.0034204 | 0.3442054 |
| 26 | APT D-24 | NW SW Sec. 24-11N-4W | 10.0596604 | 6.1871384 |
| 27 | Goldman 7 | NE SW Sec. 24-11N-4W | 3.5611594 | 2.4789873 |
| 28 | Goldman 5 | NW SE Sec. 24-11N-4W | 0.7375980 | 1.0798843 |
| 29 | APT 24-1 | SW NW Sec. 24-11N-4W | 6.7641816 | 7.3012383 |
| 30 | Carey 24 | SE NW Sec. 24-11N-4W | 9.1188007 | 4.4432013 |
| 31 | Goldman 1 | SW NE Sec. 24-11N-4W | 4.0847448 | 3.0700722 |
| 32 | Goldman 4 | SE NE Sec. 24-11N-4W | 1.0586092 | 0.8121106 |
| 33 | APT C-24 | NW NW Sec. 24-11N-4W | 2.5824338 | 4.0190344 |
| 34 | Carey A-24 | NE NW Sec. 24-11N-4W | 0.3006739 | 1.4323327 |
| 35 | Goldman 2A | NW NE Sec. 24-11N-4W | 0.3759890 | 0.9562857 |
| 36 | Goldman 3 | NE NE Sec. 24-11N-4W | 1.3804837 | 0.6679522 |
| 37 | Dosby | SE NW Sec. 13-11N-4W | 1.5806141 | 1.5625460 |
| 38 | Rowland | SW SE Sec. 13-11N-4W | 0.4125950 | 0.2723784 |
| 39 | Goldman 6 | NE SE Sec. 13-11N-4W | 0.9572407 | 0.4235536 |
| 40 | SW SW 13 | SW SW Sec. 13-11N-4W | 0.0036977 | 0.1215558 |
| 41 | SE SE 14 | SE SE Sec. 14-11N-4W | 0.0019644 | 0.0638069 |
| 42 | NW 23 | NW Sec. 23-11N-4W | 0.0172400 | 0.5801033 |

PLAN OF UNITIZATION

EAST WHEATLAND UNIT

CLEVELAND AND OKLAHOMA COUNTIES, OKLAHOMA

JANUARY 1, 1990



EXHIBIT

3

## TABLE OF CONTENTS

SECTION                                                    PAGE NUMBER

ARTICLE 1
DEFINITIONS

1.1   Unit.................................................    1

1.2   Unit Area............................................    1

1.3   Unitized Formation...................................    1

1.4   Unitized Substances..................................    1

1.5   Allocable Unitized Substances........................    1

1.6   Oil and Gas..........................................    2

1.7   Working Interest.....................................    2

1.8   Royalty Interest.....................................    2

1.9   Royalty Owner........................................    2

1.10  Working Interest Owner, Owner or Lessee..............    2

1.11  Operating Committee..................................    2

1.12  Tract................................................    2

1.13  Unit Operating Agreement.............................    2

1.14  Unit Operator........................................    2

1.15  Tract Participation..................................    2

1.16  Unit Participation...................................    2

1.17  Outside Substances...................................    2

1.18  Oil and Gas Rights...................................    2

1.19  Unit Operations......................................    3

1.20  Unit Equipment.......................................    3

1.21  Unit Expense.........................................    3

1.22  Effective Date.......................................    3

1.23  Commission...........................................    3

1.24  Person...............................................    3

1.25  Singular and Plural – Gender.........................    3

1.26  Joint Account........................................    3

1.27  Phase................................................    3


ARTICLE 2
EXHIBITS

2.1   Exhibits.............................................    3
      2.1.1     Exhibit A..................................    3
      2.1.2     Exhibit B..................................    3

2.2   Reference to Exhibits................................    3

2.3   Correcting Errors....................................    3

**ARTICLE 3**
**CREATION AND EFFECT OF UNIT**

3.1   Oil and Gas Rights Unitized................    4

3.2   Personal Property Excepted..................    4

3.3   Amendment of Leases and Other Agreements.....    4

3.4   Continuation of Leases and Term Royalties....    4

3.5   Titles Not Transferred......................    5

3.6   Development Obligation......................    5

3.7   Injection Rights............................    5


**ARTICLE 4**
**PLAN OF OPERATION**

4.1   Unit Operator...............................    5

4.2   Operating Methods...........................    5

4.3   Change of Operating Methods.................    5

4.4   Cooperative Agreements......................    5


**ARTICLE 5**
**ALLOCATION OF UNITIZED SUBSTANCES**

5.1   Tract Participation.........................    6

5.2   Relative Tract Participations...............    6

5.3   Allocations to Tracts.......................    6

5.4   Distribution Within Tracts..................    6

5.5   Taking Unitized Substances in Kind..........    6

5.6   Failure to Take in Kind.....................    7

5.7   Responsibility for Royalty Settlements......    7

5.8   Sliding Scale Royalty.......................    7

5.9   Royalty on Outside Substances...............    7
       5.9.1    Gas.................................    7
       5.9.2    Liquid Hydrocarbons...........    7
       5.9.3    Other..............................    8

5.10  Ownership of Outside Substances.............    8


**ARTICLE 6**
**USE OR LOSS OF UNITIZED SUBSTANCES**

6.1   Use of Unitized Substances..................    8

6.2   Royalty Payments............................    8

**ARTICLE 7**
**PRODUCTION AS OF THE EFFECTIVE DATE**

7.1   Oil or Liquid Hydrocarbons in Lease Tanks....   8

7.2   Overproduction................................   8

**ARTICLE 8**
**TITLES**

8.1   Title Information.............................   9

8.2   Warranty and Indemnity........................   9

8.3   Production Where Title is in Dispute..........   9

8.4   Payment of Taxes..............................   9

8.5   Payment of Taxes to Protect Title.............   9

8.6   Transfer of Title.............................   10

**ARTICLE 9**
**EASEMENTS OR USE OF SURFACE**

9.1   Grant of Easements............................   10

9.2   Use of Water..................................   10

9.3   Surface Damages...............................   10

9.4   Airport Lease.................................   10

**ARTICLE 10**
**INDIVIDUAL RELATIONSHIPS AND RIGHTS**

10.1   No Partnership...............................   11

10.2   No Sharing of Market.........................   11

10.3   Information to Royalty Owners................   11

**ARTICLE 11**
**GENERAL POWERS OF UNIT OPERATOR**

11.1   General Powers of Unit Operator..............   11

**ARTICLE 12**
**FORCE MAJEURE**

12.1   Force Majeure................................   11

**ARTICLE 13**
**NOTICES**

13.1   Notices......................................   12

13.2   Notice of Transfer of Title..................   12

ARTICLE 14
ORGANIZATION AND EFFECTIVE DATE

14.1 Designation of Representatives.............    12

14.2 Organizational Meeting......................    12

14.3 Effective Date..............................    12

14.4 Orders Approving Unit - When Final..........    12

14.5 Nonapproval of Plan of
            Unitization by Commission..........    13

14.6 Failure to Take Over Operations.............    13

14.7 Certificate of Effectiveness................    13

ARTICLE 15
TERM

15.1 Term........................................    13

15.2 Effect of Termination.......................    13

15.3 Salvaging Equipment Upon Termination........    14

15.4 Certificate of Termination..................    14

15.5 Obligation Payable After Termination........    14

ARTICLE 16
AMENDMENT TO PLAN OF UNITIZATION
AND ENLARGEMENT OF UNIT

16.1 Amendment and Enlargement....................    14

ARTICLE 17
GENERAL

17.1 Amendments Affecting
            Working Interest Owners............    14

17.2 Action by Working Interest Owners...........    14

17.3 Lien and Security Interest..................    14

17.4 Carved-Out Interest
            Subject to this Agreement..........    14

ARTICLE 18
CONFLICT

18.1 Conflict with Unit Operating Agreement.......    15

ARTICLE 19
RENTAL SETTLEMENT

19.1 Payment of Rental or Minimum Royalties.......    15

**ARTICLE 20**
**GOVERNMENTAL AUTHORITY**

20.1 Laws and Regulations......................    15


**ARTICLE 21**
**COOPERATIVE AGREEMENTS**

21.1 Cooperative Agreements Relating to Lands
       Near or Adjacent Unit Areas.........    15


**ARTICLE 22**
**COVENANTS**

22.1 Covenants Run with Land.....................    15


**ARTICLE 23**
**APPEARANCES**

23.1 Appearances Before Governmental
       Agencies and Authorities...........    16


**ARTICLE 24**
**WAIVER**

24.1 Waiver of Certain Remedies..................    16


**ARTICLE 25**
**SEVERABILITY**

25.1 Severability of Terms or Provisions.........    16


**ARTICLE 26**
**SIGNING, RATIFICATION, OR APPROVAL**

26.1 Representations.............................    16

26.2 Original, Counterparts or Ratifications......    17

26.3 Joinder in Dual Capacity....................    17

26.4 Heirs, Successors and Assigns...............    17

26.5 Approval of the Oklahoma City Airport Trust
       and City of Oklahoma City, Oklahoma.........    17


**ARTICLE 27**
**INTEREST OWNER RATIFICATION**

27.1 Ratification and Joinder of Plan of
       Unitization dated January 1, 1990,
       East Wheatland Unit, Cleveland and
       Oklahoma Counties, Oklahoma.................    17

PLAN OF UNITIZATION

EAST WHEATLAND UNIT

CLEVELAND AND OKLAHOMA COUNTIES, OKLAHOMA

WITNESSETH

The following shall constitute the Plan of Unitization applicable to the EAST WHEATLAND UNIT, Cleveland and Oklahoma Counties, Oklahoma, created pursuant to authority of Sections 287.1 - 287.15, inclusive, Title 52, Oklahoma Statutes, 1971. Its purposes are the unitized management, operation and further development of the Unitized Formation as herein defined, all to the end that a greater ultimate recovery of Oil and Gas may be had therefrom, that waste be prevented, and the correlative rights of the respective owners be protected.

ARTICLE 1
DEFINITIONS

As used in this Plan of Unitization, the terms herein shall have the following meaning:

1.1 UNIT means the EAST WHEATLAND UNIT, Cleveland and Oklahoma Counties, Oklahoma.

1.2 UNIT AREA means all lands committed to this Plan of Unitization; such Unit Area is identified by Tracts shown on Exhibit A and described in Exhibit B. Said exhibits may be modified to reflect changes in the Unit Area as provided in Article 17.

1.3 UNITIZED FORMATION means those common sources of supply of Oil and Gas underlying the Unit Area, and commonly known or described as follows:

The Prue Sand, as found between the depths of 7454 feet and 7558 feet
The Skinner Sand, as found between the depths of 7758 feet and 7668 feet
The Red Fork Sand, as found between the depths of 7668 feet and 7758 feet
The Hunton Lime, as found between the depths of 7758 feet and 8005 feet
in the TXO Production Corp. - Airport Trust "D" 33 #1 well, located 1980 feet from the South line and 1980 feet from the West line of the SE/4 of Section 33, Township 11 North, Range 4 West, Oklahoma County, Oklahoma, or the stratigraphic equivalents of said zones and/or any zones in the same common source of supply as said zones.

1.4 UNITIZED SUBSTANCES (Unit Production) means all Oil and Gas within or produced from the Unitized Formation, except Oil and Gas designated as Outside Substances.

1.5 ALLOCABLE UNITIZED SUBSTANCES means Unitized Substances except Unitized Substances utilized for injection into the Unitized Forma- tion, Unitized Substances used for fuel in Unit Operation and any Unitized Substances that are unavoidably lost or are used in confor- mity with good operating practices within the Unit Area for drilling, operating or other production or development purposes for the Unitized Formation. The points at which Allocable Unitized Substances are identified and measured are the outlets of the one or more tank batteries which are located within the Unit Area where such Allocable Unitized Substances are available for delivery to the respective owners thereof.

1

1.6  OIL AND GAS means oil and gas as such in combination one with the other, and includes oil, gas, casinghead gas, casinghead gasoline, condensate, or other hydrocarbons or associated minerals, or any combination or combinations thereof.

1.7  WORKING INTEREST is an interest in Allocable Unitized Substances by virtue of a lease, operating agreement, fee title, or otherwise, which interest is chargeable with and obligated to pay or bear, either in cash or out of production or otherwise, all or a portion of the cost of drilling, developing, producing and operating Unitized Substances. The owner of Oil and Gas Rights that are free of a lease or other instrument conveying the Working Interest to another shall be regarded as a Working Interest to the extent of seven-eighths (7/8ths) of its interest in Allocable Unitized Substances, and as a Royalty Owner with respect to its remaining one-eighth (1/8th) interest therein.

1.8  ROYALTY INTEREST is a right to or interest in any portion of the Allocable Unitized Substance or proceeds thereof other than that of a Working Interest.

1.9  ROYALTY OWNER is a Person who owns a Royalty Interest.

1.10 WORKING INTEREST OWNER, OWNER, OR LESSEE is a Person who owns a Working Interest.

1.11 OPERATING COMMITTEE is the committee formed pursuant to the Unit Operating Agreement, and consists of a representative of each Working Interest Owner as more particularly specified in Article 4 of the Unit Operating Agreement.

1.12 TRACT is a parcel of land committed to this Plan of Unitization. All initial Tracts are identified by Tract number on Exhibit A and described on Exhibit B. Additional Tracts may be committed to this Plan of Unitization as provided in Article 16 hereof and Exhibits A and B shall be modified accordingly.

1.13 UNIT OPERATING AGREEMENT is the agreement having the same Effective Date as this agreement, entitled "Unit Operating Agreement, East Wheatland Unit, Cleveland and Oklahoma Counties, Oklahoma," and executed by the Working Interest Owners. Such agreement shall govern the conduct of Unit Operations and the rights and obligations of Working Interest Owners regarding such operations.

1.14 UNIT OPERATOR is the Working Interest Owner designated by Working Interest Owners under the Unit Operating Agreement to conduct Unit Operations. The initial Unit Operator shall be TXO Production Corp.

1.15 TRACT PARTICIPATION means the percentage described on Exhibit B for each Tract committed to this Plan of Unitization. Such percentages may be amended from time to time as new Tracts are added to the Unit Area pursuant to Article 16 hereof.

1.16 UNIT PARTICIPATION of each Working Interest Owner means that percentage which is the sum total of the percentages obtained by multiplying the Working Interest of such Working Interest Owner in each Tract by the Tract Participation of such Tract.

1.17 OUTSIDE SUBSTANCES means all substances obtained from any source, other than the Unitized Substances; and injected into the Unitized Formation.

1.18 OIL AND GAS RIGHTS means the right to explore, develop and operate lands within the Unit Area for the production of Unitized Substances, or to share in the production so obtained or the proceeds thereof.

1.19 UNIT OPERATIONS means all operations conducted by the Unit Operator pursuant to this Plan of Unitization and the Unit Operating

2

Agreement for or on account of the development and operation of the Unitized Formation for the production of Unitized Substances.

1.20 UNIT EQUIPMENT means all personal property, lease and well equipment, tank batteries, gathering pipeline systems, plants and other facilities and equipment taken over or otherwise acquired by the Unit Operator on behalf of the Working Interest Owners for use in Unit Operations pursuant to the Unit Operating Agreement.

1.21 UNIT EXPENSE means all cost, expense or indebtedness incurred by the Unit Operator pursuant to this Plan of Unitization and the Unit Operating Agreement for or on account of Unit Operations.

1.22 EFFECTIVE DATE is that date designated by the Operator as the Effective Date pursuant to Article 14.3 hereof.

1.23 COMMISSION means the Corporation Commission of the State of Oklahoma.

1.24 PERSON means any individual, corporation, partnership, common law or statutory trust, association of any kind, the State of Oklahoma, or any subdivision or agency thereof acting in a proprietary capacity, guardian, executor, administrator, fiduciary of any kind, or any entity holding Oil and Gas Rights in the Unitized Formation.

1.25 SINGULAR AND PLURAL - GENDER. Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

1.26 JOINT ACCOUNT shall mean the account showing the charges paid and credits received in the conduct of the Unit Operations and which are to be shared by the Working Interest Owners.

1.27 PHASE is the period of time in which certain Tract Participations are in effect as defined by Exhibit B.

ARTICLE 2
EXHIBITS

2.1 EXHIBITS. Attached hereto are the following exhibits which are made a part of this Plan of Unitization and incorporated herein by reference.

    2.1.1   EXHIBIT A, which is a map that shows the boundary lines of the Unit Area and the Tracts therein.

    2.1.2   EXHIBIT B, which is a schedule that describes each Tract in the Unit Area and shows its Tract Participation.

2.2 REFERENCE TO EXHIBITS. When reference is made to an exhibit, it is to the exhibit as originally attached or, if revised, to the last revision.

2.3 CORRECTING ERRORS. The shapes and descriptions of the respective Tracts have been established by using the best information available. If it subsequently appears that any Tract, because of diverse royalty or working interest ownership on the Effective Date, should have been divided into more than one Tract, or that any mechanical miscalculation or clerical error has been made in the preparation of Exhibits or information shown thereon, Unit Operator, with the approval of the Operating Committee, shall correct the mistake by revising the Exhibits to conform to the facts. The revision shall not include any re-evaluation of engineering or geological interpretations used in determining Tract Participation. Each such revision of an exhibit shall be effective at 7:00 a.m. on the first day of the calendar month next following the filing of the revised exhibit with the Secretary of the Commission, or on such

3

other date as may be determined by the Operating Committee and set forth in the revised exhibit. All parties having a right to participate in production from unit operations shall be furnished with copies of such revised exhibits.

## ARTICLE 3
## CREATION AND EFFECT OF UNIT

3.1 OIL AND GAS RIGHTS UNITIZED. Subject to the provisions of this Plan of Unitization, all Oil and Gas Rights of Royalty Owners in and to the lands described in Exhibit B, and all Oil and Gas Rights of Working Interest Owners in and to said lands, are hereby unitized insofar as the respective Oil and Gas Rights pertain to the Unitized Substances, so that Unit Operations may be conducted as if the Unitized Substances had been included in a single lease executed by all Royalty Owners, as lessors, in favor of all Working Interest Owners, and as if the lease had been subject to all of the provisions of this Plan of Unitization.

3.2 PERSONAL PROPERTY EXCEPTED. Subject to the provisions of the Unit Operating Agreement, all lease and well equipment, materials, and other facilities heretofore or hereafter placed by any of the Working Interest Owners on the lands covered hereby and not designated as Unit Property under the Unit Operating Agreement, shall be deemed to be and shall remain personal property belonging to and may be removed by the Working Interest Owners. The rights and interests therein as among Working Interest Owners are set forth in the Unit Operating Agreement.

3.3 AMENDMENT OF LEASES AND OTHER AGREEMENTS. The provisions of the various leases, agreements, division and transfer orders, or other instruments covering the respective Tracts or the production therefrom will not be amended except to the extent necessary to conform to the provisions of this Plan of Unitization, but otherwise shall remain in effect.

The division orders shall cover and apply to that fraction of the Unitized Substances as is allocated to the respective Tracts in Exhibit B (effective as of the Effective Date of the Unit) and purchasers of Unitized Substances are authorized to pay therefore in accordance with the applicable percentages set forth in Exhibit B without procuring new division orders.

Inclusion under the Plan of Unitization of parcels or tracts of real property which are covered by outstanding Oil and Gas Leases will not have the effect of waiving, abandoning, changing or altering the obligation of a Lessee under any such Lease to pay the Lessors under the same lease the royalty amount specified in the Oil and Gas Lease to which they are parties. In this regard, it is understood and agreed that a Lessor under any outstanding Oil and Gas Lease shall be entitled to receive the royalty amount stipulated in such outstanding Oil and Gas Lease of that portion of the Allocable Unitized Substances, identified in Article 5 hereof.

3.4 CONTINUATION OF LEASES AND TERM ROYALTIES. All Unit Operations, including, but not limited to, the commencement, drilling or operation of a well upon any part of the Unit Area shall be deemed for all purposes, except for the purpose of determining payments to Royalty Owners, as operations upon or production from each Tract by the several owners thereof, and such operations or production shall constitute compliance with and continue in effect each lease, or term mineral or royalty interest, or other agreement pertaining to the development of the Unitized Formation, as to all lands covered thereby, just as if such operations had been conducted and a well had been drilled on and was producing from each Tract.

4

3.5 <u>TITLES NOT TRANSFERRED.</u>  Nothing contained in this Plan shall be construed to require or result in a transfer of any part of the title of any Person to the Oil and Gas Rights in any Tract, nor shall the Unit be regarded as owning any of the Unit Production. All property, whether real or personal, which the Unit may in any way acquire, hold or possess, shall not be acquired, held or possessed by the Unit for its own account, but shall be so acquired, held or possessed by the Unit for the account and benefit of the several Working Interest Owners within the Unit Area and shall be owned by such Working Interest Owners in undivided interests, in accordance with their respective percentages of Unit Participation, subject, however, to the right of the Unit Operator to the possession, management, use or disposal of the same in the proper conduct of its affairs, and subject to any lien the Unit or the Unit Operator may have thereon to secure the payment of Unit Expense.

3.6 <u>DEVELOPMENT OBLIGATION.</u>  Nothing herein shall relieve the Working Interest Owners from the obligation to develop reasonably as a whole the lands and leases subject hereto.

3.7 <u>INJECTION RIGHTS.</u>  Royalty Owners hereby grant Working Interest Owners, subject to the provisions of Article 20 herein, the right to inject into the Unitized Formation any substances or material, including Outside Substances, in whatever amounts Working Interest Owners deem expedient for Unit Operations.  Royalty Owners further grant Working Interest Owners the right to use any existing, abandoned or plugged wells, and the right to drill new wells in the Unitized Formation, to be used as injection wells, withdrawal wells, observation wells, or wells for any other purpose, in connection with the Working Interest Owners' operations in the Unitized Formation.

ARTICLE 4
PLAN OF OPERATION

4.1 <u>UNIT OPERATOR.</u>  TXO Production Corp. is hereby designated as the initial Unit Operator.  Unit Operator shall have the exclusive right to conduct Unit Operations, which shall conform to the provisions of this agreement, and the Unit Operating Agreement.  If there is any conflict between such agreements, this agreement shall govern.

4.2 <u>OPERATING METHODS.</u>  To the end that the quantity of Unitized Substances ultimately recoverable may be increased and waste prevented, the Unit Operator under direction of the Operating Committee, shall, with diligence and in accordance with good engineering and production practices, conduct a secondary recovery operation by means of injecting gas, water or other substances, or combinations thereof, into the Unitized Formation, and/or conduct any other producing operation calculated to enhance the recovery of hydrocarbons.

4.3 <u>CHANGE OF OPERATING METHODS.</u>  Nothing herein shall prevent the Operating Committee from discontinuing or changing in whole or in part any method of operation which, in its opinion, is no longer in accord with good engineering or production practices.  Other methods of operation may be conducted or changes may be made by the Operating Committee from time to time if determined by it to be feasible, necessary, or desirable to increase the ultimate recovery of Unitized Substances.

4.4 <u>COOPERATIVE AGREEMENTS.</u>  The Operating Committee, with prudent practices in the interest of conservation and to increase the recovery of Unit Production, may authorize and empower the Unit Operator to execute in their behalf, agreements with the owners of working interests in lands outside the Unit Area for cooperative development, operation, injection or similar programs with respect

5

to the equivalent of the Unitized Formation outside the Unit Area. Any such agreement shall make provision for the drilling or conversion, equipping and operating of compensating fluid injection wells in the Unitized Formation and adjoining equivalent of the Unitized Formation outside the Unit Area. Any such agreement shall in no way affect or alter the percentages of participation established hereunder as to the parties hereto, nor shall the same provide for the sharing or allocation of production as between the Unit Area, as herein defined, and any outside lands.

## ARTICLE 5
## ALLOCATION OF UNITIZED SUBSTANCES

5.1 **TRACT PARTICIPATION.** The Tract Participation of each Tract is shown in Exhibit B. The Tract Participation of each Tract is and shall be calculated using the formula shown in Exhibit B.

5.2 **RELATIVE TRACT PARTICIPATIONS.** If the Unit Area is enlarged or reduced, the revised Tract Participations of the Tracts remaining in the Unit Area and which were within the Unit Area prior to the enlargement or reduction shall remain in the same ratio one to another.

5.3 **ALLOCATIONS TO TRACTS.** Allocable Unitized Substances shall be allocated to the several Tracts in accordance with the respective Tract Participations. The amount of Unitized Substances allocated to each Tract, regardless of whether it is more or less than the actual production of Unitized Substances from the well or wells, if any, on such Tract, shall be deemed for all purposes to have been produced from such Tract.

5.4 **DISTRIBUTION WITHIN TRACTS.** The Allocable Unitized Substances allocated to each Tract shall be distributed among, or accounted for to the Persons entitled to share in the production from such Tract in the same manner, in the same proportions, and upon the same conditions as they would have participated and shared in the production from such Tract, or in the proceeds thereof, had this Plan of Unitization not been adopted, and with the same legal effect. If any Oil and Gas Rights in a Tract are or become divided and owned in severalty as to different parts of the Tract, the owners of the divided interests, in the absence of any agreement providing for a different division, shall share in the Unitized Substances allocated to the Tract, or in the proceeds thereof, in proportion to the surface acreage of their respective parts of the Tract. The owner of Oil and Gas Rights that are free of lease or other instrument conveying the Working Interest to another shall be regarded as a Working Interest to the extent of seven-eights (7/8ths) of its interest in Allocable Unitized Substances, and as a Royalty Owner with respect to its remaining one eighth (1/8th) interest therein.

5.5 **TAKING UNITIZED SUBSTANCES IN KIND.** Each Working Interest Owner shall have the right to take in kind or separately dispose of its proportionate share of all Allocable Unitized Substances produced from the Unit Area. Any extra expenditure incurred in the taking in kind or separate disposition by any Working Interest Owner of its proportionate share of the production shall be borne solely by such Working Interest Owner. The Allocable Unitized Substances allocated to each Tract shall be delivered in kind to the respective Working Interest Owners entitled thereto by virtue of the ownership of Oil and Gas Rights therein or by purchase from such owner. Subject to the provisions of Article 20, herein, such Working Interest Owners or the purchasers of the Allocable Unitized Substances, shall have the right to construct, maintain, and operate within the Unit Area all necessary facilities for that purpose, provided that they are so constructed, maintained, and operated as not to interfere with Unit Operations. Any extra expenditures incurred by Unit Operator by reason of the delivery in kind of any portion of the Allocable

6

Unitized Substances shall be borne by the receiving Working Interest Owner. If a Royalty Owner has the right to take in kind a share of Allocable Unitized Substances and fails to do so, the Working Interest Owner of such Royalty Owner shall be entitled to take in kind such share of the Allocable Unitized Substances.

5.6 FAILURE TO TAKE IN KIND. If any Working Interest Owner fails to take in kind or separately dispose of its share of Allocable Unitized Substances, Unit Operator shall have the right, but not the duty to purchase for its own account or sell to others such share; provided that, all contracts of sale by Unit Operator of any other Working Interest Owner's share of Allocable Unitized Substances shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but in no event shall any such contract be for a period in excess of one (1) year. The proceeds of the sale of Allocable Unitized Substances so disposed of by Unit Operator shall be paid to the Working Interest Owner entitled thereto.

5.7 RESPONSIBILITY FOR ROYALTY SETTLEMENTS. Any Working Interest Owner receiving in kind or separately disposing of all or part of the Allocable Unitized Substances allocated to any Tract or receiving the proceeds therefrom shall be responsible for the payment thereof to the Persons entitled thereto, and shall indemnify all other Persons including Unit Operator, against any liability for all royalties, overriding royalties, production payments, net profits interest and all other payments chargeable against or payable out of such Allocable Unitized Substances or the proceeds therefrom. In the event the Unit Operator undertakes for any Working Interest Owner to sell or to make payments of royalties, overriding royalty payments, production payments, or any other payment chargeable against or payable out of such Allocable Unitized Substances or the proceeds therefrom, any such Working Interest Owner shall indemnify, save and hold harmless Unit Operator from and against any claims, damages, loss or judgment arising out of the activities of Unit Operator with respect to such transactions.

5.8 SLIDING SCALE ROYALTY. Any royalty or other payment which varies, under the terms of the instrument creating it, according to actual production from a Tract or according to the capability of the well or wells located thereon to produce, shall on and after the Effective Date hereof be computed upon that portion of the Allocable Unitized Substances allocated to the particular Tract and not upon the actual production of Oil and Gas from the Tract or the capability of the well or wells located thereon to produce. If any such royalty or other payment depends on the production or pipeline runs from a well, such production or pipeline runs shall be determined by dividing the Allocable Unitized Substances allocated to the Tract by the number of wells located thereon that were capable of producing as of the Effective Date hereof. For the purpose of this provision, any Tract without such a producing well as of the Effective Date shall be deemed to have one (1) such well.

5.9 ROYALTY ON OUTSIDE SUBSTANCES. No payments shall be due or payable to Royalty Owners with respect to any Outside Substances produced from the Unitized Formation.

5.9.1 GAS. If Gas is the Outside Substance injected, fifty percent (50%) of any Gas subsequently produced from the Unitized Formation and sold, or used for other than Unit Operations, shall be deemed to be the Outside Substance so injected until the total volume thereof equals the total volume of the Outside Substance so injected.

5.9.2 LIQUID HYDROCARBONS. If liquid hydrocarbons are the Outside Substance injected and the Allocable Unitized Substances subsequently produced contain such liquid hydrocarbons as determined by the Operating Committee by applicable tests, then commencing on the first day of the calendar month following such a determination, one hundred

7

percent (100%) of all Oil production attributable to each Tract and sold during any month shall be deemed to be Outside Substance so injected until the volume thereof equals the volume charged to the Working Interest Owner of each such Tract for the Outside Substances so injected.

5.9.3  OTHER.  If other Outside Substances are injected and the Allocable Unitized Substances subsequently produced contain such other Outside Substances as determined by the Operating Committee by applicable tests, then commencing on the first day of the calendar month following such a determination, one hundred percent (100%) of any Outside Substance subsequently produced from the Unitized Formation and sold or used for other than Unit Operations shall be deemed to be the Outside Substance so injected until the total volume thereof equals the total volume of the Outside Substance so injected.

5.10 OWNERSHIP OF OUTSIDE SUBSTANCES.  Unit Operator upon direction of Unit Operating Committee shall procure Outside Substances for injection into the Unitized Formation for pressure- maintenance purposes.  All costs to procure such Outside Substances shall be considered costs of Unit Operations and shall be borne by the Working Interest Owners in accordance with their Unit Participation percentage.  Cost of disposal of Outside Substance produced from the Unitized Formation shall be considered a cost of Unit Operations and shall be borne by the Working Interest Owners in accordance with their Unit Participation percentage.


## ARTICLE 6
## USE OR LOSS OF UNITIZED SUBSTANCES

6.1  USE OF UNITIZED SUBSTANCES.  Unit Operator may use or consume as much of the Unitized Substances as it deems necessary for Unit Operations, including but not limited to the injection thereof into the Unitized Formation.

6.2  ROYALTY PAYMENTS.  No royalty, overriding royalty, production, or other payments shall be payable upon, or with respect to, Unitized Substances used or consumed in Unit Operations or which otherwise may be lost or consumed in the production, handling, treating, transportation, or storing of Unitized Substances.


## ARTICLE 7
## PRODUCTION AS OF THE EFFECTIVE DATE

7.1  OIL OR LIQUID HYDROCARBONS IN LEASE TANKS.  Unit Operator shall gauge or otherwise determine the amount of merchantable Unitized Substances that are in lease tanks as of 7:00 a.m. on the Effective Date.  Oil or other liquid hydrocarbons in treating vessels, separation equipment, and tanks below pipeline connections shall not be considered merchantable.  Any such merchantable Oil or other liquid hydrocarbons not promptly removed may be sold by the Unit Operator for the account of the Working Interest Owners entitled thereto who shall pay royalty due thereon under the provisions of the applicable leases or other contracts.

7.2  OVERPRODUCTION.  If, as of the Effective Date hereof, any Tract is overproduced with respect to the allowable, as set by any governmental body, of the wells on that Tract, and the amount of overproduction has been sold or otherwise disposed of, such overproduction shall be charged against such Tract as having been delivered to the Persons entitled to Unitized Substances allocated to such Tract.

8

ARTICLE 8
TITLES

8.1 TITLE INFORMATION. In the event of a questionable title, and upon request of the Operating Committee, the Working Interest Owners of a Tract shall furnish and make available to the Operating Committee or the Unit Operator an abstract brought to the date of the request, together with all other title information in the possession of such Working Interest Owners, affecting their title and that of their Royalty Owners to the Oil and Gas Rights in and to such Tract.

8.2 WARRANTY AND INDEMNITY. Each Person who may claim to own a Working Interest or Royalty Interest in and to any Tract or the Unitized Substances allocated thereto, shall be deemed to have warranted its title to such interest, and, upon receipt of the Unitized Substances or the proceeds thereof to the credit of such interest, shall indemnify and hold harmless all other Persons in interest from any loss due to failure, in whole or in part, of its title to any such interest; provided that, such indemnity shall be limited to an amount equal to the net value that has been received from the sale or receipt of Unitized Substances attributed to the interest as to which title failed. Each failure of title will be deemed to be effective, insofar as this Plan of Unitization is concerned, as of the first day of the calendar month in which such failure is finally determined, and there shall be no retroactive adjustment of Unit Expense, or retroactive allocation of Unitized Substances or the proceeds therefrom as a result of title failure.

8.3 PRODUCTION WHERE TITLE IS IN DISPUTE. If the title or right of any Person claiming the right to receive in kind all or any portion of the Unitized Substances allocated to a Tract is in dispute, Unit Operator at the direction of the Operating Committee, shall either:

a. require that the Person to whom such Unitized Substances are delivered or to whom the proceeds thereof are paid, furnish security for the proper accounting therefor to the rightful owner if the title or right of such Person fails in whole or in part; or,

b. withhold and market the portion of the Unitized Substances with respect to which title or right is in dispute, and impound the proceeds thereof until such time as the title or right thereto is established by a final judgment of a court of competent jurisdiction or otherwise to the satisfaction of the Operating Committee, whereupon the proceeds so impounded shall be paid to the Person rightfully entitled thereto.

8.4 PAYMENT OF TAXES. The Unit Operator shall render for assessment and pay or cause to be paid for the account of all Working Interest Owners and their respective Royalty Owners, the Oil and Gas severance taxes, ad valorem taxes based on Oil and Gas production and conservation taxes (collectively referred to as "taxes"). Any taxes so paid by the Unit Operator shall be charged to the accounts of the Working Interest Owners in proportion to their participation in the production of Allocable Unitized Substances or in the gross or net proceeds thereof under this agreement or as may be provided by applicable law. Unit Operator shall charge the proper proportion of said taxes to the Royalty Owners for whose account said taxes had been paid, and may currently retain and deduct sufficient Allocable Unitized Substances, or the proceeds thereof, from each such Royalty Owner's shares to secure reimbursement for the taxes so paid.

8.5 PAYMENT OF TAXES TO PROTECT TITLE. If any taxes are not paid when due by or for any owner of surface rights to lands within the Unit Area, or severed mineral interests or Royalty Interests in such lands, or lands outside the Unit Area on which Unit Equipment is located, Unit Operator may, with approval of the Operating Committee at any time prior to tax sale, or expiration of period of redemption after tax sale, pay the tax and redeem or purchase such rights, interests, or property. Any such payment shall be an item of Unit

9

Expense. Unit Operator shall, if possible, withhold from any proceeds derived from the sale of Unitized Substances otherwise due any delinquent taxpayer an amount sufficient to defray the costs of such payment, such withholding to be credited to Working Interest Owners. Such withholding shall be without prejudice to any other remedy available to Unit Operator or Working Interest Owners.

8.6 **TRANSFER OF TITLE.** Any conveyance of all or any part of any interest owned by a Person with respect to any Tract shall be subject to this agreement. Any such conveyance of all or any part of such interest shall not be effective until the transferee agrees in writing and is actually able to assume all duties, obligations, and liabilities of this agreement. No change of title shall be binding upon Unit Operator, or upon any Person other than the Person so transferring, until 7:00 a.m. on the first day of the calendar month next succeeding the date of receipt by Unit Operator of a photocopy or a certified copy of the recorded instrument evidencing such change in ownership if such receipt is prior to the fifteenth day of the month received. If receipt by Unit Operator is after the fifteenth day of the month, the transfer shall be effective at 7:00 a.m. the first day of the second succeeding calendar month.

## ARTICLE 9
## EASEMENTS OR USE OF SURFACE

9.1 **GRANT OF EASEMENTS.** Subject to the provisions of Article 20, herein, the Unit and Unit Operator shall have the right to use as much of the surface of the land within the Unit Area as may be reasonably necessary for Unit Operations, including, but not limited to, the right at any time and from time to time to lay, construct, repair, maintain, operate and use pipelines, power and communication lines and poles, roads, reservoirs, tanks and earthen pits and to remove, at any time and from time to time, any and all such property and fixtures, including casing in wells, erected or placed on the Unit Area by the Unit Operator or Lessees; provided, nothing herein shall be construed as leasing or otherwise conveying to the Unit a site for a water, gas injection, processing or other plant, or camp site.

9.2 **USE OF WATER.** Subject to the provisions of Article 20, herein, the Unit shall have free use of salt water from the Unit Area for Unit Operations, including the right to drill salt water supply wells, provided that, Unit Operator shall not use fresh water from the Unit Area unless acquired by separate contract with the rightful owners of the fresh water. The Unit may convert any existing or future completed, dry, or abandoned wells in the Unit Area to salt water, supply, injection or disposal wells. Unit Operator shall not use water from any well, lake, pond or irrigation ditch of a landowner without consent of the landowner.

9.3 **SURFACE DAMAGES.** The Unit shall pay the rightful owners for damages, as required under existing oil and gas leases, written agreements or any applicable state statutes, to the surface of the Unit Area that result from Unit Operations.

9.4 **AIRPORT LEASE.** Committed to this Plan of Unitization will be a Lease from the Oklahoma City Trust and the City of Oklahoma City, Oklahoma dated July 1, 1980 ("Airport Lease"). Said Lease covers a substantial portion of the Will Rogers World Airport Area. Due to the Federal, State and City requirements which must be met regarding drilling and production operations on or near airport locations, the terms of this Lease dealing with such requirements will be made a stipulated provision of this Plan as follows:

Inclusion under the Plan of Unitization of the "Airport Lease" will not have the effect of waiving, abandoning, changing or altering any requirement, provision, or stipulation contained

10

therein relating to the Lessee's conduct of any and all operations and activities on the parcel or tract covered by said "Airport Lease", including, without limiting the generality thereof, (i) the location of wells or facilities of whatsoever nature on said parcel or tract; (ii) the conduct of all operations, drilling, and/or other activities of any kind or character on said parcel or tract; (iii) the approvals and consents which must be obtained prior to the location of wells or other facilities on such parcel or tract, or prior to the conduct of any operations or activities on the parcel or tract (all such Lease requirements, provisions, or stipulations hereinafter collectively referred to as "Operational Covenants"). Any Unit Operator under this Plan of Unitization conducting any such operations or activities on any parcel or tract covered by the "Airport Lease" shall, as to such parcel or tract, comply with all operational covenants contained therein in the same manner and to the same extent as if such Unit Operator were the Lessee under the "Airport Lease".

## ARTICLE 10
### INDIVIDUAL RELATIONSHIPS AND RIGHTS

10.1 NO PARTNERSHIP. The duties, obligations, and liabilities of the Working Interest Owners shall be several and not joint or collective. This Plan of Unitization is not intended to create, and shall not be construed to create, an association or trust, or to impose a partnership duty, fiduciary duty, obligation, or liability with regard to any one or more of the Working Interest Owners. Each Working Interest Owner shall be individually responsible for its own obligations as herein provided.

10.2 NO SHARING OF MARKET. Nothing herein shall be construed to provide, directly or indirectly, for any cooperative refining, joint sale, or marketing of Unitized Substances.

10.3 INFORMATION TO ROYALTY OWNERS. Each Royalty Owner shall be entitled to receive the information from its Working Interest Owner to which such Royalty Owner is entitled by an existing agreement.

## ARTICLE 11
### GENERAL POWERS OF UNIT OPERATOR

11.1 GENERAL POWERS OF UNIT OPERATOR. The Unit Operator is authorized for the account of all owners of Oil and Gas Rights within the Unit Area to supervise and conduct the further development and operation of the Unit Area for the production of Unitized Substances, pursuant to the powers conferred and subject to the limitations imposed by the provisions of Sections 287.1 - 287.15, inclusive, Title 52, Oklahoma Statutes 1971, or any amendment thereof and by this Plan of Unitization.

## ARTICLE 12
### FORCE MAJEURE

12.1 FORCE MAJEURE. All obligations arising hereunder, except for the payment of money, shall be suspended while compliance is prevented, in whole or in part, by a labor dispute, fire, war, civil disturbance, act of God; by Federal, state, or municipal laws; by any rule, regulation, or order of a governmental agency; by inability to secure materials; or by any other cause or causes, whether similar or dissimilar, beyond reasonable control of the Person. No Person shall be required against its will to adjust or settle any labor dispute. Neither this agreement nor any lease or other instrument subject hereto shall be terminated by reason of the suspension of Unit Operations due to any one or more of the causes set forth in this Article.

11.

ARTICLE 13
NOTICES

13.1 NOTICES.  All notices required hereunder shall be in writing and shall be deemed to have been properly served when sent by mail, telegram or other means to the address of the representative of each Working Interest Owner on the Operating Committee as furnished to Unit Operator in accordance with Article 3.1 of the Unit Operating Agreement.

13.2 NOTICE OF TRANSFER OF TITLE.  No change of title shall be binding on the Unit or Unit Operator until the first day of the calendar month next succeeding the date of receipt by Unit Operator of evidence satisfactory to it of such change in ownership if such receipt is prior to the fifteenth day of the month received.  If such receipt is after the fifteenth day of such month, the transfer shall be effective at 7:00 a.m. the first day of the second succeeding calendar month.  Each such transfer, assignment or conveyance whether so stating or not, shall operate to impose upon the Person or Persons acquiring such interest the obligation of the predecessor in interest with respect to the interest so transferred and shall likewise operate to give and grant to the Person or Persons acquiring such interest all benefits attributable hereunder to such interest.

ARTICLE 14
ORGANIZATION AND EFFECTIVE DATE

14.1 DESIGNATION OF REPRESENTATIVES.  Each Working Interest Owner shall inform Unit Operator in writing of the names and addresses of the representative and alternate on the Operating Committee who are authorized to represent and bind such Working Interest Owner with respect to Unit Operations.  The representative or alternate may be changed from time to time by written notice to Unit Operator.

14.2 ORGANIZATIONAL MEETING.  Subject to call by the Working Interest Owner designated herein as the Unit Operator, the representatives designated by the Working Interest Owners shall meet to perfect the organization of the Operating Committee.  The meeting may be held at any time after twenty (20) days from the entry of the order of the Commission approving the Unit.  Notice of the time and place of the meeting shall be mailed at least ten (10) days prior thereto to all Working Interest Owners within the Unit Area whose names and addresses are known to the Unit Operator, as well as those Working Interest Owners who, within ten (10) days from the date of the order, have notified the Secretary of the Commission in writing of their desire to be notified of the meeting.

14.3 EFFECTIVE DATE.  The Unit Operator shall determine, and give Working Interest Owners reasonable notice of, the date when the Unit Operator will take over and commence Unit Operations, said date will be the Effective Date for the purpose of this agreement.  The Effective Date shall not be less than fifteen (15) days from the entry of the order approving the Unit or more than six (6) months after the time when the order approving the Unit becomes final.

14.4 ORDERS APPROVING UNIT - WHEN FINAL.  The order of the Commission approving the Unit means the order or orders approving this Plan of Unitization and finding that it has been signed, ratified, or approved by Working Interest Owners and Royalty Owners owning the percentage interest in the Unit Area required to make it effective.  If the approval of this Plan of Unitization and the finding of approval by the Working Interest Owners and Royalty Owners are by separate order, the date of the later of the two (2) orders shall be regarded as the date of entry of the order approving the Unit.

12

Unit Operator is furnished with the original or a certified copy of the instrument of transfer and a written assumption of obligations hereunder by such successor in interest.

### ARTICLE 23
### APPEARANCES

23.1  APPEARANCES BEFORE GOVERNMENTAL AGENCIES AND AUTHORITIES.  The Unit Operator shall have the right to appear for and on behalf of any and all interests affected hereby (except as to a Person hereto which appears on its own behalf) before state and federal regulatory agencies and to appeal from orders issued under the regulations of said agencies or to apply for relief from any of said regulations or in any proceedings relative to operations before said agencies or any other legally constituted authority.  Any other Person shall also have the right, at its own expense, to appear on its own behalf and be heard in any such proceeding, and the Unit Operator shall promptly notify each such Person of any such proceedings of which the Unit Operator has knowledge.

### ARTICLE 24
### WAIVER

24.1  WAIVER OF CERTAIN REMEDIES.  Each Person executing or ratifying this agreement covenants that, during the existence of this Plan of Unitization, such Person shall not resort to any action at law or in equity to partition the Unit Area or Tract therein, any equipment or the facilities used for Unit Operations, and to that extent waives the benefit of all laws authorizing such partition.

### ARTICLE 25
### SEVERABILITY

25.1  SEVERABILITY OF TERMS OR PROVISIONS.  If any terms or provisions of this agreement or any application thereof shall be invalid or unenforceable, the remainder of this agreement and any other application of such terms or provisions shall not be affected thereby.

### ARTICLE 26
### SIGNING, RATIFICATION, OR APPROVAL

26.1  REPRESENTATIONS.  Each Working Interest Owner hereby represents to each other Person executing or ratifying this agreement that the execution, delivery and performance of this agreement and of the Unit Operating Agreement will not:

   a.  result in a breach of or constitute a default under any assignment, contract or instrument of transfer to which such Working Interest Owner is a party or by which it or its properties and interests within the Unit Area may be presently bound or affected; or

   b.  violate any provision of any law, rule, regulation, order, writ, judgment, decree, determination or award presently in effect having application to such Working Interest Owner or such properties and interests.

If any Person executing or ratifying this agreement shall be in breach of or in default under such assignment, contract or instrument of transfer or be in violation under item (b) above, such Person shall bear the entirety of all
loss, damage and liability resulting therefrom and shall indemnify and hold harmless all other Persons executing or ratifying this agreement against such loss, damage and liability and shall defend such other Persons against the same.

16

26.2 <u>ORIGINAL, COUNTERPARTS OR RATIFICATIONS.</u> This Plan of Unitization may be signed, ratified, or approved by signing the original of this instrument, a counterpart, or other instrument adopting the provisions hereof, all with the same effect as if all Persons had signed the same instrument. Persons signing, ratifying, or otherwise approving this Plan of Unitization thereby agree to all the provisions hereof.

26.3 <u>JOINDER IN DUAL CAPACITY.</u> The signing, ratification, or approval of this Plan of Unitization as herein provided by any Person as either a Working Interest Owner or as a Royalty Owner shall commit all interests in the Unit Area that may be owned or controlled by such a Person.

26.4 <u>HEIRS, SUCCESSORS AND ASSIGNS.</u> The signing, ratification, or approval of this Plan of Unitization shall be binding upon the heirs, personal representatives, successors and assigns of the Persons so signing, ratifying or approving the same.

ARTICLE 27
INTEREST OWNER RATIFICATION

27.1 <u>RATIFICATION AND JOINDER OF PLAN OF UNITIZATION DATED JANUARY 1, 1990, EAST WHEATLAND UNIT, CLEVELAND AND OKLAHOMA COUNTIES, OKLAHOMA.</u> The undersigned, herein designated in the singular whether one or more, represents that he, she or it, as the case may be, is a Working Interest Owner or Royalty Owner, as defined in said Plan of Unitization, in one or more of the tracts identified on Exhibit A, attached to and made a part of said Plan of Unitization. The undersigned, being familiar with the contents thereof, desires to ratify, approve and confirm said Plan of Unitization.

NOW, THEREFORE, the undersigned does hereby ratify, approve, confirm and adopt said Plan of Unitization fully and with the same effect as if the undersigned had executed and delivered said Plan of Unitization, and does hereby unitize and pool all rights and interests of the undersigned in and to the lands situated within the Unit Area in the same manner and to the same extent as provided in said Plan of Unitization and subject to all of the terms, conditions, covenants, and provisions contained in said Plan of Unitization.

Executed this _13th_ day of _March_ , 19 _90_ .

Attest: (If a Corporation)            COMPANY: TXO PRODUCTION CORP.

By: _____          By: _____
                                          Ronald G. Becker
Title: _____          Title: _Attorney-In-Fact_


ATTEST (SEAL)                        OKLAHOMA CITY AIRPORT TRUST

_____              _____
Secretary                            Ken W. Townsend, Chairman


       Approved by the Council of the City of Oklahoma City this _22_
day of _____, 1990.

                                     CITY OF OKLAHOMA CITY

ATTEST (SEAL)
_____              _____
City Clerk                           Ronald J. Norick, Mayor

17

Except as to the "warranty" provision of Article 9.2 which is approved as to form only, the foregoing Plan of Unitization is approved as to form and legality this 21st day of _March_, 1990.

_James R. Turan_
Deputy Municipal Counselor

STATE OF OKLAHOMA    )
                     ) SS.
COUNTY OF OKLAHOMA   )

The foregoing Ratification of Plan of Unitization, East Wheatland Unit, Cleveland and Oklahoma Counties, Oklahoma, was acknowledged before me this 13th day of March ____, 1990 by Ronald G. Becker as Attorney-In-Fact on behalf of TXO Production Corp., a corporation, for and on behalf of said corporation.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal the day and year aforesaid.

_Melinda R. Burton_
Notary Public

(SEAL)

My Commission Expires:

_October 4, 1993_

STATE OF OKLAHOMA    )
                     ) SS.
COUNTY OF OKLAHOMA   )

The foregoing Ratification of Plan of Unitization, East Wheatland Unit, Cleveland and Oklahoma Counties, Oklahoma, was acknowledged before me this 16 day of ____ My ____, 1990, by Ken W. Townsend, Chairman and Trustee of the Oklahoma City Airport Trust, a public trust, on behalf of the Trust.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal the day and year aforesaid.

_Sarah A. Manning_
Notary Public

(SEAL)

My Commission Expires:

_11-28-92_

STATE OF OKLAHOMA    )
                     ) SS.
COUNTY OF OKLAHOMA   )

The foregoing Ratification of Plan of Unitization, East Wheatland Unit, Cleveland and Oklahoma Counties, Oklahoma, was acknowledged before me this 12 day of ____ My ____, 1990, by Ronald J. Norick, Mayor of The City of Oklahoma City, a municipal corporation on behalf of The City.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal the day and year aforesaid.

_Sarah A. Manning_
Notary Public

(SEAL)

My Commission Expires:

_11-28-92_

18



EXHIBIT A
EAST WHEATLAND UNIT

EXHIBIT "B"
EAST WHEATLAND UNIT
CLEVELAND AND OKLAHOMA COUNTIES, OKLAHOMA

The relative participation of the Tracts in the proposed East Wheatland Unit shall be based on the following Participation Formula:

Phase I:    Phase I Tract Participation Percentages shall be based on the parameter weighting of:

        13% Well Current Oil Production for 6 months ending 6/30/89
        13% Well Current Gas Production for 6 months ending 6/30/89
        12% Skinner Current Oil Production for 6 months ending 6/30/89
        12% Skinner Current Gas Production for 6 months ending 6/30/89
        2% Skinner Zone Hydrocarbon Pore Volume
        24% Well Remaining Oil Reserves as of 7/1/89
        24% Well Remaining Gas Reserves as of 7/1/89

        Phase I shall be in effect until the first day of the month after 580,930 barrels of oil have been produced from the Unitized Formation underlying the Unit Area after July 1, 1989, after which Phase II shall become effective.

Phase II:    Phase II Tract Participation Percentages shall be based on the parameter weighting of:

        45% Skinner Zone Hydrocarbon Pore Volume
        5% Well Ultimate Primary Oil Production
        50% Skinner Ultimate Primary Oil Production

        Phase II shall be in effect from the date Phase I Tract Participation Percentages cease to be in effect until termination of the Unit.

| TR. NO. | LEASE NAME | TRACT DESCRIPTION | PHASE I PERCENT | PHASE II PERCENT |
|---|---|---|---|---|
| 1 | Kraus | SW NW Sec. 5-10N-4W, Cleveland Co | 1.5891171 | 1.1245883 |
| 2 | Holland #1 | NW NW Sec. 5-10N-4W, Cleveland Co. | 0.4908049 | 0.8643521 |
| 3 | Holland #2 | NE NW Sec. 5-10N-4W, Cleveland Co. | 0.7208990 | 1.4504863 |
| 4 | Morava "A" | SW NE Sec. 5-10N-4W, Cleveland Co. | 1.9260759 | 3.2712464 |
| 5 | Morava "D" | NE NE Sec. 5-10N-4W, Cleveland Co. | 1.0959806 | 2.3799052 |
| 6 | Morava "G" | NW NW Sec. 4-10N-4W, Cleveland Co. | 0.3962906 | 0.9944878 |
| 7 | Bode #4-A | SW SE Sec. 32-11N-4W, Oklahoma Co. | 1.6310293 | 2.1333429 |
| 8 | Bode #3 | SE SE Sec. 32-11N-4W, Oklahoma Co. | 2.5470069 | 4.4705867 |
| 9 | Bode #5-A | NE SE Sec. 32-11N-4W, Oklahoma Co. | 0.6174585 | 0.3872406 |
| 10 | Palmblade 33-1 | NW SW Sec. 33-11N-4W, Oklahoma Co. | 1.1773715 | 1.4942057 |
| 11 | Palmblade 33-2 | NE SW Sec. 33-11N-4W, Oklahoma Co. | 0.5972880 | 1.5469397 |
| 12 | Palmblade 33-3 | SW SW Sec. 33-11N-4W, Oklahoma Co. | 3.1570373 | 4.4593176 |
| 13 | Palmblade 33-4 | SE SW Sec. 33-11N-4W, Oklahoma Co. | 3.7926030 | 3.7933803 |
| 14 | Airport Trust A 33 | NW SE Sec. 33-11N-4W, Oklahoma Co. | 4.5414773 | 4.8214821 |
| 15 | Airport Trust G 33 | SW SE Sec. 33-11N-4W, Oklahoma Co. | 0.4867486 | 0.9020312 |
| 16 | Airport Trust D 33 | NE SE Sec. 33-11N-4W, Oklahoma Co. | 5.0384205 | 3.8035422 |
| 17 | Airport Trust J4-1 | SW Sec. 34-11N-4W, Oklahoma Co. | 1.1118487 | 2.4517111 |
| 18 | Airport Trust B 34 | SE Sec. 34-11N-4W, Oklahoma Co. | 0.0077156 | 0.1236001 |
| 19 | Airport Trust M 33 | NW Sec. 33-11N-4W, Oklahoma Co. | 2.8186954 | 2.6523904 |
| 20 | Airport Trust 34-2 | SW NW Sec. 34-11N-4W, Oklahoma Co. | 2.7816999 | 2.8460791 |
| 21 | Airport Trust E 34 | N2 NW & SE NW Sec. 34-11N-4W, Okla. Co. | 5.2321710 | 4.5918179 |
| 22 | Airport Trust A 34 | SW NE Sec. 34-11N-4W, Oklahoma Co. | 1.4616190 | 2.3008748 |
| 23 | Airport Trust G 34 | SE NE & NW NE Sec. 34-11N-4W, Okla. Co. | 2.4449759 | 2.2764311 |
| 24 | Airport Trust G 34 | NE NE Sec. 34-11N-4W, Oklahoma Co. | 3.5531475 | 2.9609253 |
| 25 | Airport Trust 35-1 | SW Sec. 35-11N-4W, Oklahoma Co. | 1.6380752 | 4.2675954 |
| 26 | Airport Trust A 35 | NE Sec. 35-11N-4W, Oklahoma Co. | 0.5044696 | 1.0951271 |
| 27 | Airport Trust A 27 | SW Sec. 27-11N-4W, Oklahoma Co. | 0.5651364 | 0.4598546 |
| 28 | Airport Trust E 27 | SE Sec. 27-11N-4W, Oklahoma Co. | 0.5610576 | 3.2982576 |
| 29 | Airport Trust I 26 | N2 SW & SE SW Sec. 26-11N-4W, Okla. Co. | 6.1143129 | 4.3541326 |
| 30 | Airport Trust J 26 | SE SW Sec. 26-11N-4W, Oklahoma Co. | 7.9843706 | 5.9090156 |
| 31 | Airport Trust L 26 | N2 SE & SW SE Sec. 26-11N-4W. Okla. Co. | 5.5605378 | 6.3477275 |
| 32 | Airport Trust G 26 | SE SE Sec. 26-11N-4W, Oklahoma Co. | 3.3211183 | 3.3396772 |
| 33 | Airport Trust A 25 | SW SW Sec. 25-11N-4W, Oklahoma Co. | 2.5994378 | 2.9962555 |
| 34 | Airport Trust B 25 | SE SW Sec. 25-11N-4W, Oklahoma Co. | 2.3057319 | 2.3927106 |
| 35 | Airport Trust D 25 | NW SW Sec. 25-11N-4W, Oklahoma Co. | 4.9402391 | 3.3843567 |
| 36 | Airport Trust G 25 | NE SW Sec. 25-11N-4W, Oklahoma Co. | 1.1113228 | 2.6388148 |
| | | TOTAL | 100.0000000 | 100.0000000 |



# FELLERS SNIDER
### ATTORNEYS AT LAW

Philip A. Schovanec
405-239-7212
pschovanec@fellerssnider.com

January 15, 2025

<u>*Via Electronic with Confirmation of Delivery and Regular Mail (kasper@jadeowls.com)*</u>

Jade Owls, Inc. d/b/a Great Horned Owls, LLC
Attn: Kasper Kowalewski
27411 Myrtle Lake Lane
Katy, Texas 77494

Re:    Demand to Cease and Desist Further Operations;
East Wheatland Unit #30 and #31 Wells, and Will Rogers Unit #17 Well;
<u>Sections 23 and 26 in Township 11N, Range 4W, Oklahoma County</u>

Dear Mr. Kowalewski:

We represent the Oklahoma City Airport Trust ("OCAT"). OCAT recently made demand (the "Initial Demand") on your predecessor, Contango Resources, Inc., that it plug and abandon certain wells located on or around the OKC Will Rogers International Airport (the "Airport"). OCAT explained that the wells listed therein had ceased to produce in commercial quantities and/or were adversely affecting or interfering with the Airport's plans for development and improvements. We recently discussed this Initial Demand with you, at which time Jade Owls, Inc. d/b/a Great Horned Owls, LLC ("Jade Owls") stated that although it received a copy of this demand when it acquired these interests from Contango, you would need additional time to review it before providing a formal response on behalf of Jade Owls.

However, instead of providing a response to OCAT's Initial Demand, Jade Owls recently moved a service rig onto certain of these well locations, apparently with plans to rework these wells. As such, OCAT reiterates its demand that Jade Owls cease any reworking or recommencement operations on the wells listed in OCAT's Initial Demand, specifically including the above-referenced East Wheatland Unit #30 and #31 Wells (the "EWU #30 and #31") and Will Rogers Unit #17 Well (the "WRU #17").

As you are aware, in a typical unitized field in Oklahoma, the included oil and gas leases are often made subject to the unit operations. However, that is not the case with the Airport Lease, as included within the East Wheatland Unit ("EWU") and Will Rogers Unit ("WRU"). Rather, the Plans of Unitization for the EWU and WRU expressly provide they shall not alter or affect any provision or requirement in the Airport Lease as it relates to any oil and gas operations, with the Unit Operator being required to comply with all covenants and restrictions therein as if it was the original lessee.

100 NORTH BROADWAY, SUITE 1700, OKLAHOMA CITY, OK 73102-9211
t 405.232.0621   f 405.232.9659   FellersSnider.com



EXHIBIT
4

Demand to Cease and Desist Operations
January 15, 2025
Page 2

In this regard, the Airport Lease states all operations under the Lease must be in strict conformity with all applicable rules and requirements of Oklahoma law and the Oklahoma Corporation Commission, particularly as they relate to the use of the Airport premises. (Airport Lease ¶ 14, at p. 7). In addition, the Airport Lease prohibits any operation that adversely affects or interferes with Airport operations or its planned development or improvements, stating no activities shall not be conducted that "injure or destroy any of the presently constructed facilities" and/or which "adversely affect the development, improvement, operation, or maintenance of the airport or its facilities." (Airport Lease ¶ 21, at p. 9). This restriction is supported by additional Lease language which states the involved lands are intended to be used as an airport, and any right granted by the Lease is "only a temporary and incidental use of such portions of the leased premises as will not interfere" with that purpose. (Airport Lease ¶17, at p. 8). Clearly, any well or Unit operation on the Airport that adversely affects or interferes with the Airport's ability to conduct its current operations or to proceed with additional development or improvements is expressly prohibited by the terms of the Airport Lease.

As outlined in OCAT's Initial Demand to Contango, the wells listed therein, including the EWU #30 and #31 and WRU #17, have neither been commercially productive for some time nor are they being utilized in Unit operations. Consistent with our previous review, the EWU #30 and #31 still have not produced since early 2018 or been utilized in Unit operations, and the WRU #17 still has not produced since 1993 or otherwise been utilized in Unit operations. Moreover, these wells are also directly interfering with the operation, improvement, and development of the Airport, including the Airport's plans to construct additional airport hangars which are necessary for continued operations.

As such, any plan to rework these wells, particularly the EWU #30 and #31 and WRU #17, while refusing OCAT's demand that they be plugged and the surface locations restored, violates the Airport Lease. OCAT therefore demands that Jade Owls immediately cease all efforts to rework or recommence production on the EWU #30 and #31 as well as the WRU #17, and desist from all similar operations on any of the other well listed in OCAT's Initial Demand, other than as necessary to have them plugged and their surface locations restored.

It is our hope that Jade Owls will voluntarily comply with this latest demand by OCAT and provide our office with written notice of your intent to do so within five (5) business days from the date of this letter. If we do not receive an acceptable response or if we are otherwise unable to agree on a resolution of this demand within this time period, then OCAT will have no option but to seek judicial relief. In such event, OCAT will be requesting, among other remedies, that Jade Owls be enjoined from proceeding with any attempt to rework or recommence production from any well listed in OCAT's Initial Demand, as well as an award of all attorney fees and costs incurred in connection with any such legal action.

Demand to Cease and Desist Operations
January 15, 2025
Page 3

We appreciate your prompt attention to this demand.  Please do not hesitate to give me a call if you would like to further discuss this letter or OCAT's Initial Demand.

Sincerely,

Philip A. Schovanec